BERKSHIRE COUNTY SUPERIOR COURT
PITTSFIELD, MASSACHUSETTS

| | |
|---|---|
| Town of Lee Massachusetts<br>Plaintiff,<br><br>v.<br><br>Monsanto et al.<br>Defendants. | Case No. 2476CV00044<br>Jury Trial Demanded. |

**MEMORANNDUM OF LAW IN SUPPORT OF PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANTS' LIABILITY**

**FACTUAL BACKGROUND**

Plaintiff incorporates by reference as if fully stated here Plaintiff's attached Material Facts supported by Exhibits filed with the Complaint DJ-1 to DJ-24 and attached Exhibits DJ-25 to DJ-38.

**STANDARD OF REVIEW.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party need only show that there is an absence of evidence to support the non-moving party's case in order to prevail on summary judgment. *Cellco Partnership v. Town of Grafton, 366 F. Supp. 2d. 71, 82 (D. Mass. 2004)*. The non-moving party "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Borges v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)*. Where, as here, the Defendants fail to establish a prima facie claim or where the Defendants 'own

1

admissions negate an essential element of its claim, summary judgment is warranted.' See *Carmona v. Toledo, 215 F.3d 124, 133 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986))*.

## FEDERAL PREMPTION

Federal law preempts or supersedes state and local laws, regulations, ordinances, when they conflict with the federal law.

This so-called conflict preemption occurs "when compliance with both state and federal law is impossible, or when the state law or any other legal action stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress*." Weaver's Cove Energy, LLC v. Rhode Island Coastal Resources Management Council, 589 F.3d 458, 472 (1st Cir. 2009)* (quoting *Good v. Altria Group, Inc., 501 F.3d 29, 47 (1st Cir. 2007)).* Conflict preemption is rooted in the Supremacy Clause of the U.S. Constitution (*Art VI, Clause 2*), which invalidates state laws that "*interfere with, or are contrary to the law of [C]ongress, made in pursuance of the [C]onstitution." Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 604 (1991) (quoting Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L. Ed. 23 (1824)).*

Several federal courts, including the U.S. District Court for the District of Massachusetts, have applied preemption principles to uphold CERCLA cleanups. Specifically, federal courts have held that municipalities lack the authority to impose requirements that conflict with CERCLA cleanups and "pose an obstacle to accomplishment of CERCLA's objectives" to clean up hazardous substances. (*See, e.g., Town of Acton v. W.R. Grace &Co. Conn., Technologies, Inc., 2014 WL 7721850, *9 (D. Mass. Sept. 22, 2014*)).

In the Town of Acton case, the federal court for the District of Massachusetts held that CERCLA preempted a municipal bylaw that imposed more stringent groundwater cleanup standards because the bylaw would conflict with EPA's selected cleanup plan and "would displace the judgment rendered by the EPA and deprive it of 'the flexibility needed to address site-specific problems.'" *Town of Acton at *11; see also United States v. City & Cnty of Denver, 100 F.3d 1509, 1512 (10th Cir. 1996).* CERCLA preempts municipal ordinance conflicting with selected clean-up plan.

Other federal courts have held that CERCLA preempts municipal ordinances that ban the management of hazardous waste in a manner that conflicts with a selected CERCLA remedy, similar to a potential ban of the Upland Disposal Facility (UDF). In City & County of Denver, the Tenth Circuit ruled that CERCLA preempted a municipal zoning ordinance that prohibited the maintenance of hazardous waste in industrially zoned areas. (100 F.3d at 1512)  ("A zoning ordinance which bars the maintenance of hazardous waste dramatically restricts the range of options available to the EPA… [and] would prevent a permanent on-site remedy.").

Accordingly, CERCLA preempts any action that the Town of Lee might wish to take to impede in any way construction of the dump or the partial cleanup of the River as specified in CERCLA ORDER 2020.

Federal preemption, however, does not apply for any action including the one delineated in this complaint in which the Town of Lee is seeking damages for harms to humans and the environment caused by a criminal and/or civil conspiracy of Defendants.

In *N.J. Dept. of Envtl. Prot. v. MN Mining & Manufacturing Co. 3007 U.S. Dist LEXIS 49613* the court offers a lengthy analysts as to why a **Plaintiff's claim for damages filed under state or common law against a Defendant currently remediating a polluted site under CERCLA is not preempted from having her claims adjudicated by state or federal courts. Quoting directly from District Court Judge Noel L. Hillman. U.S.D.J.:**

> As was discussed by Judge Brown in Occidental, ***Congress did not intend for state claims arising out of a contaminated site operating under a CERCLA remediation plan to be completely preempted by CERLCA.*** *Occidental, 2006 U.S. Dist. LEXIS 71245, 2006 WL 2806231, at \*8; see also New Jersey Dep't of Environmental Protection v. Exxon Mobil Corp., 393 N.J. Super. 388, 923 A.2d 345, 359 (N.J. Super. Ct. App. Div. 2007)* ***(finding a clear legislative recognition of the NJDEP's "authority to seek compensation not just for physical [\*17] injury to natural resources, but also for the loss of the benefits they provide").*** *"If Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear." Empire, 126 S. Ct. at 2135. …* ***Plaintiffs are appropriately seeking damages pursuant to state law as contemplated by Congress when it enacted CERCLA. Plaintiffs have not directly challenged the CERCLA remediation, and the*** *interpretation of CERCLA is not essential to Plaintiffs' claims. As such, Plaintiffs' Complaint does not raise a substantial federal question on its face,*

3

*and Defendants have not demonstrated that CERCLA completely preempts Plaintiffs' state law claims. Based on these findings, and in consideration that section 1441 is to be strictly construed against removal, it is apparent that this Court lacks subject matter jurisdiction over Plaintiffs' Complaint, and it must therefore be remanded to state court. An appropriate Order will be entered.(Emphasis here only). 2007 U.S. Dist. LEXIS 49613, *19*

### LEE IS ENTITLED TO RECOVER DAMAGES TO HUMANS AND THE ENVIRONMENT FOR DEFENDANTS CRIMINAL AND CIVIL CONSPIRACY TO HARM HUMANS AND THE ENVIRONMENT.

CERCLA's statute has two primary purposes: to clean up contaminated sites through "removal or remedial action [42 U.S.C. § 9607(a)(4)(A)-(B) (1988)] **and to establish liability for natural resource damages**. 42 U.S.C. § 9607(a)(4)(C).

Response costs under CERCLA are those costs associated with removal of hazardous waste and any other remedial costs associated with cleaning up hazardous substances. (42 U.S.C. § 9607(a)(4)(A)-(B)). **Response costs do not incorporate the damage, present and future to the resource itself.** *(Id.)*

CERCLA restricts the recovery for natural resource damages to the federal government, state governments, or Indian tribes § 9607 (f)(1). Courts have ruled that "state" allows local governments to act as trustees and recover injuries for natural resources they control or own. *City of New York v. Exxon Corp. 533 F. Supp. 509 (S.D.N.Y. (1986); Mayor of Boonton v. Drew Chem. Co. 621 F. Supp. 663 (D.N.J.(1985).* These courts found it persuasive that the definition of natural resources includes such resources belonging to, manage by, held in trust by, appertaining to, or otherwise controlled by the United States …any State **or local government.**" (42 U.S.C. 9601 (16)). (Emphasis here only).

CERCLA authorizes the federal government or state government to act as a trustee, appoint a trustee, or to assess natural resource damages. (42 U.S.C. § 9607(f)(2)). The government or **the public trustee** may bring a cause of action to recover for injury to

4

natural resources, (*Id*). The trustee's finding of injury to natural resources receives the benefit of a doctrine by providing that trustees could recover from liable parties on behalf of the public resources. Under the public trust doctrine, the government is deemed to hold natural resources in trust for the public. This concept originated when the Supreme Court announced that the government held submerged lands under navigable waters in Lake Michigan in trust for the people and thus a legislative conveyance was incompatible with the public trust . (*Illinois Cent. R.R. v. Illinois , 146 U.S. 387, 562-53 (1892)*).

CERCLA broadly defines natural resource as the following:

> *Land, fish, biota, air, water, ground water, drinking water supplies, and other resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States ... any state **or local government**, any foreign government , any Indian tribe, or, if such resources are subject to a trust restriction on alienation , any member of an Indian Tribe. (42 U.S.C. § 9601(16)(1988)). (Emphasis here only).*

The trustee's finding of injury to natural resources benefits from a rebuttable presumption that the assessment is accurate, provided the trustee promulgates the action in compliance with the National Contingency plan under section 9651. (42 U.S.C § 9607(f)(2)(C)).

CERCLA empowers public trustees to recover damages exceeding those traditionally recovered at common law. *Barry Breen 14 Envlt. L. Rep (Envlt. L. Inst.) 10, 304, 10, 307(1984; Woodward and Hope, Harvy. Env. L. Rev. 189, 190 (1990*) quoting Senator Baucus "… Trustees must value the option to use those market and premarket methods of evaluation that in the trustee's judgment most accurately evaluate injury to natural resources and compensate the public for its losses".

**CERCLA contains a limitation of fifty million dollars for natural resource damages. This limitation does not apply when (a) the release resulted from willful misconduct or willful negligence within the privity of knowledge of the responsible party**. (42 U.S.C. § 9601(c)(2)).

The United States Federal Court approved in 2000 a Consent Decree ("CD") allowing EPA to seek from GE Response Costs to remove PCBs from the Housatonic River. (DJ-

26**, MFs-2, 3, and 4**).  The CD contains an appointment for a trustee to recover natural resource damages.  The Trustee negotiated with GE to receive 15 million dollars for natural resource damages for all the impacted cities and towns in Western Massachusetts and Connecticut. (**DJ-26 pgs. 257-278**).

   The Court, the Trustee, EPA, The Commonwealth of Massachusetts and the State of Connecticut were never made aware by Monsanto and GE that given the forever chemical character of PCBs (**MFs-43 to 63**), it will become impossible to remove all PCBs from the River (**MFs-81 to 87**).  Monsanto learned in 1968 that PCBs dumped into Rivers do not flow with water currents but became imbedded in the sediment of Rivers.  Monsanto and GE failed to communicate this knowledge to all CD signatories of the 2000 CR. (**MFs 23 to 43 54 to 59 and MF-80).**

   GE never made the CD signatories of the CD in 2000 aware that GE dumped PCBs into the River between 1972 and 1977 under a criminal and/or civil conspiracy entered into between GE and Monsanto in 1972. (**MFs 116, 117, 118, 119, 120).**

   The Trustee contracted with GE, with the limited knowledge the Trustee had at the time, to be paid 15 million dollars to be divided equally between the Commonwealth and the State of Connecticut for natural resource damages. (DJ-26 ps.257-279).

   Monsanto ceased manufacturing PCBs for many of its applications in 1970 and notified all its plasticizer customers. (**MFs-38 to 61.**).

   On or about **February 18, 1970,** Monsanto notified all its electrical customers that PCBs tended to leak from electrical devises. (**MF- 62**).

   In **March of 1970,** GE conducted an internal review and strongly urged Monsanto to continue to manufacture PCBs**. (MF-64**)

   In **September of 1971,** the US Government convened a task force to "strengthen the government ability to protect the public from potential hazards of PCBs". **(MF-68)**

6

In **November of 1971,** the private, non-profit organization funded by industry The American National Standards Institute (ANSI), established committees on the use of PCBs in transformers and capacitors. E.L. Rabb of GE was named chairman of the transformer subcommittee and Dr. A. Pozefsky of GE was named chairman of the capacitor subcommittee, (**MF-69**)

On **December 16, 1971,** E.L. Rabb Manager of Dielectric Systems, Insulation systems Laboratory Operations at GE's Transformer Plant in Pittsfield, Massachusetts was assigned by J.F. McAllister, Manager, Product Quality, Central General Electric Company to prepare a report describing the alleged essential role that PCBs play in electrical transformers for submission to the US Office and Science Technology by **January 3, 1972. (MFs-70 to 74).**

For a more detailed history of how GE decided to enter into a criminal and or Civil conspiracy with Monsanto to continue purchasing PCBs from Monsanto see (**MFs. 61-74**).

**Finally on January 31, 1972**, Monsanto fully aware that PCBs were harmful to humans and the environment (**MFs. 33 to 74**) entered into a criminal and or civil conspiracy with GE to continue selling PCBs to GE provided GE indemnify Monsanto for any damages to humans and the environment caused by the PCBs it purchased from Monsanto after January 31, 1972. (**DJ-20, MF-75).**

The United States, through EPA, issued on February 24, 1976 the report of its task force convened in **September of 1971** to "strengthen the government ability to protect the public from potential hazards of PCBs". **(MF-68)**

EPA admitted in this report dated February 24 1976 that:

> *Many, but not all, of the facets of the problem are addressed; many of the estimates presented ae based on engineering and scientific judgment instead of hard data, simply because hard data in these areas are not available. (DJ-29 pg. 3; … Page ID# 4361".(* **MF-88**).

7

With regard of any possible need of PCBs after 1971, the report stated unequivocally:

*Since the voluntary restrictions by Monsanto in 1971 of PCB sales for use in electrical use in closed electrical systems only, PCBs have largely been eliminated from usage in hydraulic and heat transfer systems. Adequate substitutes were generally available at the time of the Monsanto restriction, and the present usage of PCBs (believed to be minor) should be replaceable by alternatives with minimal disadvantage.(**DJ-38 pg. 19**.*

*Transformers filled with Askarel (MF-26 ) (60-70 % PCBs) are often specified for use in buildings and hazardous locations where minimization of the fire hazard is of paramount importance. The National Fire Code requires that oil-filled units, (mineral oil) and Askarel filled units rated for service over 35 kV be enclosed in fireproof vaults when used in buildings. For units below 35kV, **the higher cost (by 20 to 30 percent of the Askarel unit is more than offset by the savings in vault construction**. (Id. pgs. 17 and 18) (Emphasis here only).*

*Approximately five percent of the transformers in service in this country contain PCBs; most transformers contain mineral oil instead of PCBs. (Id. at pg. 4)*

*One of the most important conclusions from this work is the estimation of about two times the amount of PCBs in landfills and dumps as compared to the amount of PCBs already in the environment. **The material in land disposal sites may be considered a threat to become widely dispersed over a period of time.** (id. pg. 8)(Emphasis here only).*

***The major conclusion from this portion of the study was that technically acceptable alternatives to the use of PCBs of transformers exist and that their use should not result in a significant increase in fire hazards from transformer failure. At present the selection of PCB (Askarel) transformers appears to be based primarily on cost rather than technical considerations. (Id., pg-18)**. (Emphasis here only).*

Monsanto halted all sales of PCBs in 1977 for all uses shortly after EPA Report DJ-38 was published by the United States in 1976. (**MF-32**).

8

Monsanto sold GE 60 million pounds of PCBs in the six years between 1972 and 1977 or 10 million pounds per year. (**MF-57).**

Monsanto sold GE 200 million pounds of PCBs in the twenty years between 1956 and 1977 or 10 million pounds per year. (**MF-125).**

**There is no indication anywhere that GE would have halted purchasing PCBs from Monsanto under the terms of the civil and criminal conspiracy any time after 1977. When Monsanto finally in 1977 recognized the harm it was doing to humans and the environment it halted all manufacture of PCBs.** (MFs 32 and 75 and DJ-20).

### Civil Conspiracy.

The Supreme Court of Massachusetts recognizes the *Restatement (Second of Torts § 876 (a) and (b)* as governing principles of civil conspiracy in the Commonwealth. *Kyte v. Phillip Morris Inc. 408 Mass. 162 (1990). (Citations Omitted).*

*"For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he*

- *(a) does a tortious act in concert with the other or pursuant to common design with him, or*
- *(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. (Id.)"*

### Criminal Conspiracy

"A criminal conspiracy is an agreement between two or more people to accomplish an unlawful purpose*." United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011)*. In other words, "[t]he essence of the conspiracy is an agreement to commit a crime . . . ." *United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) ( [\*359]* internal citations and quotations omitted). For the jury to convict a defendant of conspiracy, the

government must prove beyond a reasonable doubt that "(1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily participated in the conspiracy." *Dellosantos, 649 F.3d at 116*. "Under the third element, the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." *Id. United States v. Vavic 628 F. Supp. 3d 330, 358.*

    Monsanto and GE entered into a civil and criminal conspiracy on January 31, 1977 to harm humans and the environment. (*DJ-20 MF-75*). The Court should note that the signatories of this conspiracy agreement were the General Counsel and Vice-President of Monsanto and the Vice-President of General Electric.

    If a District Attorney upon learning about this criminal conspiracy through this filing decides to prosecute and win a conviction against GE and Monsanto for their criminal conspiracy— in force between 1972 and 1977—  the Town of Lee acting as as *parens patriae* will move in addition to collect damages for the Town and all its impacted citizens under the *Mandandatory Victims Restitution Act 0f 1996 18 U.S.C. § 3663A,. United States v. Jesenick, 203 U.S. Dist. LEXIS 207335.*

### THE TOWN OF LEE HAS STANDING UNDER THE PARENS PATRIAE DOCTRINE TO COLLECT DAMAGES TO HUMANS AND THE ENVIRONMENT THE RESULT OF MONSANTO-GE  AND CRIMINAL CONSPIRACY

    To establish standing under the theory of *parens patriae,* the Town must base its claim on the protection of a quasi-sovereign interest. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601 (1982).* Quasi-sovereign interests are a "set of interests" which the state has in the well-being of its citizens." *(Id. at 602)*. Quasi-sovereign interests are not sovereign interests, proprietary interests or private interests which the state "[p]ursues as a nominal party.(*Id*.).

    The U.S. Supreme Court has ruled, however, that a state (town) has a quasi-sovereign interest in the health and welfare of its populace, *Pennsylvania v. West Virginia 252*

U.S.353, 592 (1923) pollution-free air and water," *Georgia v. Tennessee Copper Co., 206 U.S. 230, 238(1907)* and the general economy of the state (town).  *Hawaii v. Standard Oil Co. of Cal.  301F. Supp. 982(D. Hawaii(1969).*

A state, under the *parens patriae* theory, undoubtedly will be able to assert a quasi-sovereign interest in its natural resources on two fronts: the health and welfare of the state's citizens *Alfred L. Snapp 458 U.S. 592, 601 (1982)* and the health and welfare of the state's economy. (*Id. at 605*). Environmental pollution not only may have direct and substantially serious consequences on the physical health of a state's citizens but also may detrimentally affect a state whose economic well-being rests, at least to a significant degree, on revenue generated by its natural resources.

The U.S. Supreme Court has been confronted only twice with *parens patriae* cases seeking damages. *Georgia v. Pennsylvania R.R. Co., 324 U.S. 439 (1945) (price-fixing conspiracy); Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251 (1972) (anti-trust violation).* In both cases, the Court upheld the propriety of the *parens patriae* claims but, upon grounds unrelated to the *parens patriae* theory, denied the award of damages. *Georgia v. Pennsylvania R.R. Co., 324 U.S. at 452 (damages denied because the Interstate Commerce Commission had approved the allegedly collusive rates, and, therefore, an award of damages would serve as an inappropriate rebate); Hawaii v. Standard Oil Co. of Cal., 405 U.S. at 265 (damages denied because section 4 of the Clayton Act did not provide for damage relief for injury to the state's general economy).* **In neither case, however, did the Court dispute the validity of damages recovery in *parens patriae* suits.**

### THERE ARE NO STATUTE OF LIMITATIONS ISSUES IN THIS ACTION

Massachusetts law proscribes "actions of tort . . . shall be commenced only within three years next after the cause of action accrues." <u>MASS. GEN. LAWS ch. 260, § 2A</u>. **Massachusetts does not define when a cause of action accrues by statute, so the Massachusetts Supreme Judicial Court ("SJC") uses a "discovery rule"** that

calculates when the statute of limitations begins in a tort action. *Hendrickson v. Sears, 365 Mass. 83, 83-84 (Mass. 1974)*. The SJC established that notice is required before a plaintiff's claims are time barred, however, notice begins when a plaintiff learned or should reasonably have learned that they were harmed by [*6] the defendant's conduct. *See Olsen v. Bell Tel. Laboratories, Inc., 388 Mass. 171, 174-75 (Mass. 1983); Bowen v. Eli Lilly & Co., 408 Mass. 204, 557 N.E.2d 739, 741 (Mass. 1990)*.

**Accordingly, under the discovery rule**, the statute of limitations does not begin to run until a "reasonably prudent person" in the plaintiff's position has (1) knowledge or sufficient notice that she was harmed and (2) knowledge or **sufficient notice of what the cause of the harm** was. *Bowen, 557 N.E.2d at 742; see also Fidler v. Eastman Kodak Co., 714 F.2d 192 (1st Cir. 1983)* (holding that **notice include not only knowledge of injury but also knowledge of cause**). "Whether a plaintiff has knowledge or notice of her injury **and the causes o**f her injury is determined by using a reasonable person standard." *DeLellis v. Johnson & Johnson, No. 20-11665-MLW, 2021 U.S. Dist. LEXIS 144441, at *13 (D. Mass. July 26, 2021) (citing Riley v. Presnell, 409 Mass. 239, 565 N.E.2d 780, 785-86 (Mass. 1991))*. Therefore, *"even if a plaintiff does not subjectively know of her injury or the cause of her injury*, if circumstances exist such that the plaintiff reasonably should have known, then the statute of limitations is not tolled by the discovery rule." *Id.* **Knowledge of a likely cause** of injury is ordinarily enough to start the statute of limitations. " Fidler, 714 F.2d at 199. *Ducat v. Ethicon, Inc. 2023 U.S. Lexis 192909 pg. 6. (Emphasis here only)*.

**The statute of limitations for the harm to humans and the environment begins to run for the Town of Lee and its residents when it was learned that Monsanto and GE entered into a secret civil and criminal conspiracy in 1972.  (***DJ-20***). The Monsanto-GE contract clearly specified in writing that PCBs sold after January 31, 1972 will harm humans and the environment. The Town learned about the conspiracy agreement on December 15, 2023 the day counsel learned of the existence of the secret contract between GE and Monsanto.**

12

**DJ-25 enumerates in detail all the correspondence between counsel and other attorneys currently litigating cases against Monsanto in Washington State who disclosed to counsel the agreement and who provided counsel with a copy of the same. DJ-20.**

## CONCLUSION

The Town respectfully requests that this Court grant the requested Partial Summary Judgment on the issue of liability of Monsanto and GE so that the Town can prove at trial the damages GE and Monsanto have caused the Town.

May 9, 2024

Respectfully submitted by
s/*Cristóbal Bonifaz, Esq.*
Cristóbal Bonifaz MA Bar # 548405
*Law Offices of Cristóbal Bonifaz*
*180 Maple Street*
*Conway, Massachusetts 01341*
*Tel: 413-369-4263*
*Cell Number 413-522-7604*

## Certificate of Service

Plaintiff the Town of Lee will serve all Defendants with this document on the same date that Defendants are served with the Original Complaint, The First Amended Complaint and accompanying Exhibits. Notification of the service will be filed in Court timely.

                                                              s/ *Cristobal Bonifaz, Esq.*

                                                              Cristobal Bonifaz, Esq.