**BERKSHIRE COUNTY SUPERIOR COURT**
**PITTSFIELD, MASSACHUSETS**

————————————————— |

Town of Lee Massachusetts |     Case No. 2476CV00044
Plaintiff, |     Jury Trial Demanded.
 |
v. | 
 |
Monsanto et al. | 
Defendants. | 
————————————————— _ _|

—————————————————————————————

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

—————————————————————————————

TABLE OF CONTENTS

ITEMS                                                    PAGE

INTRODUCTION……………………………………………………          1

PARTIES……………………………………………………………          5

JURISDICTION AND VENUE…………………………………………          8

LIABILITY OF GENERAL ELECTRIC……………………………..          9

LIABILITY OF MONSANTO, SLUTIA AND PHARMACIA……….          14

DAMAGES THE TOWN OF LEE IS SEEKING AT TRIAL…………          35

THE SETTLEMENT AGREEMENT  NOT TO CHALLENGE

THE CERCLA ORDER AND THE CONTRACT BETWEEN

MONSANTO AND GENERAL ELECTRIC………………………          38

FIRST CAUSE OF ACTION………………………………………          41

SECOND CAUSE OF ACTION……………………………………          42

PRAYEER FOR RELIEF……………………………………          42

JURY DEMAND……………………………………………….          43

<u>TABLE OF EXHIBITS</u>

EXHIBIT #                    <u>TITLE OF EXHIBIT</u>

DJ-1.   EPA's INITIAL  CERCLA  ORDER JANUARY 29, 2016

DJ-2.   GE's PREDESIGN INVESTIGATION OF PCB DUMP NOVEMBER 24, 2021.

DJ-3.   EPA's FINAL CERCLA ORDER DECEMBER 16, 2020.

DJ-4 .   MONSANTO's STATEMENT OF UNDISPUTED MATERIAL FACTS
                IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT IN "TOWN
                OF  WESTPORT  V. MONSANTO." JANUARY 20, 2017.

DJ-5.   MONSANTO's DOCUMENT. SEPTEMBER 20, 1955.

DJ-6.   MONSANTO's DOCUMENT.  MAY 24, 1956.

DJ-7.   MONSANTO's DOCUMENT. JANUARY 21, 1957.

DJ-8.   MONSANTO's DOCUMENT.  AUGUST 30, 1957.

DJ-9.   MONSANTO's DOCUMENT.  MARCH 6, 1969.

DJ-10.  MONSANTO's DOCUMENT.  APRIL 2, 1969.

DJ-11.  MONSANTO's DOCUMENT.  FEBRUARY 27, 1970.

DJ-12.  MONSANTO's DOCUMENT.  DECEMBER 5, 1969.

DJ-13.  MONSANTO's DOCUMENT. OCTOBER 2, 1969.

DJ-14. MONSANTO'S MEMORANDUM IN WESTPORT.

DJ-15. EPA'S LETTER TO COUNSEL. NOVEMBER 8, 2022.

DJ-16. SETTLEMENT AGREEMENT.

  DJ-17. MUNICIPAL AGREEMENT.

DJ-18.   BALLOT QUESTION TO RESCIND  SETTLEMENT AGREEMENT.

DJ-19. DECISION OF THE BOARD OF HEALTH OF LEE.  APRIL 27, 2023.

DJ-20.   GE's IDEMNIFICATION CONTRACT WITH MONSANTO.

TABLE OF  EXHIBITS (CONTINUED)

EXHIBIT NUMBER                    TITLE OF EXHIBIT


DJ-21. MONSANTO'S CANCER COMPILATION OF ITS EMPLOYEES.1949-1970s.

DJ-22. LETTER COUNSEL TO GENERAL ELECTRIC. NOVEMBER 10, 2023.

DJ-23. LETTER OF TOWN OF LEE TO PUBLIC OFFICIALS. JANUARY 2, 2024

DJ-24. EPA's "FAST FACTS" AT PAGE 2.

DJ-25. COMUNICATION WITH COUNSEL

DJ-26. CONSENT DECREE

DJ-27. OPINION OF DAVID CARPENTER

DJ-28. MASSACUSETTS ATTORNEY GENERAL'S REPORT

DJ-29. GENERAL ELECTRIC DOCUMENT PREPARED FOR THE US

DJ-30. MONSANTO v. GE COMPLAINT

DJ-31. MAGNETEEC V> MONSANTO COMPAINT

DJ-32. PARTS OF EPA 1976 REPORT FILED BY MONSANTO

DJ-33. EPA PROPOSED COVER FORRIVER SEDIMENS

DJ-34.| EPA PROPOSED COVERS FOR RIVER SEDIMENTS

DJ-35. DECISION OF THE COURT DENYING REMOVAL

DJ-36. GE'S REMOVAL OF CASE TO FEDERAL COURT

DJ-37. MONSANTO'S REQUEST FOR REMAND

DJ-38. FULL 1976 EPA REPORT ON PCBs

## INTRODUCTION

1. The tort of intentional infliction of harm encapsulates a basic moral principle – that if you injure someone intentionally and without just cause or excuse, then you should be liable for the commission of a tort—in addition to any crime you might commit.

2. Defendant Monsanto (including Defendants Solutia and Pharmacia) manufactured or marketed a toxic product (polychlorinated biphenyls or PCBs) from the 1930s to  the late 1970s. The toxic product was sold to defendant General Electric "GE" for use in transformers.

3. Defendant GE profited from this product and discarded hundreds of thousands of pounds of no longer usable product into the Housatonic River in full expectation that the waste product would be carried by the River to the Atlantic.

4. In 1968, Monsanto discovered that the product would in fact never be carried by rivers to the Atlantic but instead would become permanently imbedded in the sediments of rivers harming humans and the environment.

5. The toxicity of the product to humans and the environment became known world-wide by the 1960s and Monsanto decided to remove from the market the portion of the product sold as plasticizer.

6. Monsanto continued marketing the most profitable use of the product to  GE with a critical caveat.

7. Monsanto unequivocally told GE unequivocally that the product will harm humans and the environment but that GE could continue buying the toxic product only if it agreed to reimburse Monsanto for any claims filed against Monsanto:

   > "… without implied limitation, any contamination of or adverse effects on humans, marine and wildlife, food, animal feed or the environment by reason of such PCBs." DJ-20

8. GE continued buying the product from Monsanto after execution of the agreement and continued to dump waste product into the flowing waters of the Housatonic River.

9. The actions of Monsanto in not removing the product from the marked when it became a certainty that the product will harm humans and the environment, and the actions of GE in continuing to profit from use of the product even if it caused harm to

humans and the environment was an intentional act that could not be justified in any society. Intentional harm to humans is a crime whether or not prosecutors decide to prosecute or not to prosecute the actors of the intentional harm.

10. Earning money is not a justification for harming humans and the environment, whether a governmental agency approves or disapproves of the action that causes the damages.

11. GE's continuing use of the toxic product created a catastrophe for the Town of Lee and its residents for which both GE and Monsanto are responsible.

12. The Environmental Protection Agency "EPA" empowered by the Comprehensive Environmental Response, Compensation, and Liability Act  "CERCLA" banned the manufacture and sales of the toxic product in 1979.

13.  EPA, after 40 years of study and litigation with GE, ordered GE in 2022 to make an effort to minimize the presence of the toxic product—polychlorinated biphenyl's "PCBs" —from a 100-mile portion of the Housatonic River "River" which flows through the City of Pittsfield "City" and the Massachusetts Towns of Lee, Lenox, Stockbridge,  Great Barrington, and Sheffield.

14. EPA, GE, the City and the towns of Lee, Lenox,  Stockbridge, Great Barrington, and Sheffield entered into a Settlement Agreement under which the City and towns agreed only not to appeal the EPA terms of the 2022 CERCLA Order to the courts in exchange for GE paying the City and Towns the sum of 62 million dollars to be divided among them.

15. The CERCLA Order was nevertheless appealed by citizens to the Court of Appeals of the First Circuit.

16. The First Circuit Court of Appeals dismissed the appeal on July 25, 2023.

17. The EPA Order is binding regardless of whether Lee agreed or disagreed with the Order, and cannot be overturned by municipal or local actions or by this Court since it has already been approved by the Court of Appeals of the First Circuit.

18. The Settlement Agreement does not prevent The Town of Lee from seeking monetary compensation from GE and Monsanto for the damages that PCBs have inflicted on the Town and its residents based on Massachusetts common law.

19. The 2022 CERCLA Order includes construction of a PCB dump in Lee, the poorest town in the region.

20. The PCB dump could have been created within the confines of the other affected towns; Lenox, Great Barrington, Sheffield or Stockbridge, but these towns are wealthy and could afford to fight the issue in Courts for years, actions which Lee could not afford.

21. It is also evident that the monies paid by GE as per the Settlement Agreement are not compensation for anything other than the towns not appealing the CERCLA Order— as per the content of the agreement—since of the 62 million paid by GE,  25 million were allocated to Lee and 25 million were allocated to Lenox. Lenox the wealthy Town north of Lee does not have to suffer damages from a PCB dump like Lee.

22. The decision by EPA to order the construction of the PCB dump in Lee saves GE the expense of transporting dredged PCBs to an out of state accredited toxic dump as EPA's scientists and engineers recommended in an initial CERCLA Order issued by EPA in 2016.

23. Monsanto manufactured all PCBs currently in the River and is jointly liable with GE for PCB contamination of the River, and the consequences of the contamination.

24. This lawsuit against Monsanto and GE does not, cannot, and will not, interfere with the CERCLA Order or the Settlement Agreement.

25. The Town of Lee is seeking from Monsanto and GE adequate compensatory and punitive damages for the harm both companies intentionally caused to Lee by creating profits for their shareholders without justification.

26.  Those damages include eliminating the use of the River for all Town's residents for years to come.

27. In the forthcoming 13 years, two billion pounds of PCB contaminated muds and soil will be dredged from the River by GE–as ordered by EPA –transported in eighty-thousand-pound truck loads through the streets of Lee, and deposited within the confines of the Town of Lee in a dump projected to be 150 feet in height on a 20-acre base. Five hundred thousand pounds of PCBs will be left in the sediments of the River by GE under EPA estimates under the CERCLA 2022 Order.

28. The sediments in the River will then be covered by a tarp with potential leakage of PCBs monitored for twenty years after completion of the partial dredging.

29. The Town Lee is seeking, as *parens patriae* on behalf of its residents, adequate compensatory and punitive damages to be determined by a jury for the catastrophic disaster Monsanto and GE have caused to Lee.

30. The CERCLA Order of 2022 cannot and does not require Monsanto and GE to pay damages to the Town for the intentional actions of GE and Monsanto that have caused and will continue to cause harm to humans and the environment.

31. EPA has no jurisdiction over Monsanto as Congress restricted EPA jurisdiction to the immediate actor that contaminated the soil and the River– in this case, GE.

32. Monsanto knew as far back as the 1930s that PCBs were toxic to humans and the environment.

33. The Town, upon publication of the contamination of the Housatonic River by GE with PCBs in the 1980s and 1990s, relied on EPA to force GE to restore the River and its banks to its original estate.

34. As Monsanto learned in 1968 from an admitted negligent event, and given the nature of the forever life of these PCBs, the task imposed on EPA by CERCLA turned out to be impossible.

35. The CERCLA Order of 2022 is at best a weak compromise of what EPA could do under the circumstances to more effectively reduce the risks to humans and the environment.

36. In early 2023, cases filed across this country against Monsanto for contamination of water- ways made the Town of Lee aware for the first time that Monsanto was jointly liable with GE for PCB related damages.

37. Cases and settlements for contamination of water-ways mostly filed by attorney generals of states like Oregon and Pennsylvania against Monsanto provided the Town of Lee with a flood of internal Monsanto documents made available in the dockets of the cases.

38. On November 10, 2023, the Town in good faith provided documentation to GE that would allow GE to seek compensation from Monsanto for all monies it had spent

and was about to spend under CERCLA Orders for the dredging of the Housatonic and Hudson Rivers. (DJ-22).

39. The basis for GE's possible action against Monsanto was Lee's assumption that GE did not know that in 1968 Monsanto had learned through a "negligent event"— Monsanto's words —that PCBs in the Hudson and Housatonic Rivers did not flow with water currents to the Atlantic. (Id.)

40. GE's lack of response to Lee's generous letter prompted generated the Town's interest and the Town sought from lawyers associated with similar cases further documentation on the matter.

41. On December 15, 2023, the Town was provided with the aforementioned contract between GE and Monsanto. (DJ-20).

42. The statute of limitation for the Town of Lee against Monsanto and GE for intentional infliction of harm to humans and the environment begins to run on December 15, 2023, the date Lee obtained the Monsanto-GE contract. (DJ-25).

**PARTIES**

43. The Town of Lee, located in Western Massachusetts is the poorest of five towns through which the PCB contaminated Housatonic River flows.  The Town is suing here as *parens patriae* on behalf of Town residents. Towns in Massachusetts can sue and be sued under Mass. G.L. ch. 40 § 2.

44. Old Monsanto is a limited liability company organized and existing under the laws of the State of Delaware. The sole member of Old Monsanto is Wyeth Holdings LLC. The sole member of Wyeth Holdings LLC is Anacor Pharmaceuticals, Inc., which is incorporated under the laws of Delaware and has its principal place of business in New York.

45. Through a series of transactions beginning in approximately 1997, Old Monsanto's business were spun off to form three separate corporations. The corporations now known as Monsanto operates Old Monsanto's agricultural business. Old Monsanto's

chemical products business is now operated by Solutia. Old Monsanto's pharmaceutical business is now operated as Pharmacia.

46.  Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemical business.

47. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain inabilities related to the chemical business, Defendants Monsanto, Solutia and Pharmacia have entered into an agreement to share or apportion liabilities, and or indemnify one or more entity, for claims arising from Old Monsanto chemical business—including the manufacture of PCBs.

48. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of reorganization, Solutia, Pharmacia and New Monsanto entered into several  agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemical business.

49. Solutia was spun off from Old Monsanto. In connection with the spin off, Old Monsanto assigned certain rights to Solutia, including the rights to enforce the Special Undertaking Agreements. This Special Understanding Agreement is labeled throughout this Complaint as the Monsanto-General Electric Contract entered between Monsanto and General Electric executed on January 31, 1972. (Exhibit DJ-22). In particular, Old Monsanto assigned its "right, title, and interest . . . in and to all of the Chemical Assets" to Solutia, which were defined to include "all rights under insurance policies and all rights in the nature of insurance, indemnification or contribution." Solutia has the right to enforce the Special Undertaking Agreements.

50. Monsanto is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business in St. Louis County, Missouri. Monsanto did not manufacture or sell PCBs. Monsanto was spun off from Old Monsanto in 2000. In 2008, Monsanto and Solutia entered into the Amended and Restated Settlement Agreement in connection with Solutia's Chapter 11 reorganization. As

51. part of that Amended and Restated Settlement Agreement, Monsanto agreed to assume financial responsibility for certain Legacy Tort Claims (which include claims for property damage, personal injury, products liability or premises liability or other damages arising out of or related to exposure to PCBs) and Environmental Liabilities related to Legacy Sites. Old Monsanto executed a Power of Attorney in favor of New Monsanto, which grants New Monsanto authority to take "all actions" over certain claims, including the PCB Lawsuits, and provides that Monsanto is Old Monsanto's "true and lawful agent and attorney." The Amended and Restated Settlement Agreement also obligated Solutia to use commercially reasonable efforts to assert indemnification rights (including the Special Undertaking Agreements) for the benefit of Monsanto and granted Monsanto the right to any benefits recovered by Solutia through its enforcement of those indemnification rights. Pursuant to the 2008 Amended and Restated Settlement Agreement and the Power of Attorney, Monsanto is and has been paying the costs incurred by Defendants to defend the PCB Lawsuits, and has also paid and/or agreed to pay amounts to settle some of the Food Chain cases and Water Cases, for the benefit of Defendants.

52. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware  LLC with principal place of business at 100 Route 206 North, Peapack, NJ 07977. Pharmacia is now a wholly owned subsidiary of Pfizer, Inc.

53. Monsanto, Solutia and Pharmacia are collectively referred in this Complaint as Monsanto.

54. General Electric, a New York Corporation has headquarters and principal place of business in Boston Massachusetts.

7

**JURISDICTION AND VENUE**

55. This Court has jurisdiction over Defendants Monsanto, Solutia, and Pharmacia because 1) these defendants have transacted business and transact business in the Commonwealth of Massachusetts specifically in relation to the sale, distribution, procurement, shipments, use, discarding, research into assessment of risks, assessment of dangers, related to Defendants PCB products, 2) these Defendants have contracted to supply services or things in the Commonwealth of Massachusetts including PCBs, 3) these Defendants have caused tortious injury by acts of omissions in the Commonwealth of Massachusetts, including the improper, intentional, reckless, and wrongful use, distribution, pollution, sales of PCBs in the Commonwealth of Massachusetts; and 4) these Defendants have caused tortious injury in the Commonwealth of Massachusetts by acts, or omissions outside the Commonwealth of Massachusetts where the Defendants have regularly done and solicited business in the Commonwealth of Massachusetts.

56. Defendants derived substantial amounts of revenue in the Commonwealth of Massachusetts through their persistent marketing of PCBs in the Commonwealth of Massachusetts.

57. This Court has jurisdiction over Defendant GE in Massachusetts because 1) GE has transacted business in the Commonwealth of Massachusetts specifically in relation to the sales distribution, procurement, shipping, discarding, assessment of risks, disposal, assessment of dangers, dumping, remediation and removal of PCBs. 2) GE has caused intentional harm to humans and the environment in Massachusetts from January 31 1971, the date of executing the Monsanto-GE contract (DJ-20) to 1979, when PCBs were banned by EPA. 3) GE's principle place of business is located in Boston, Massachusetts where GE's headquarters are located.

58. Venue is proper in Berkshire County because the Plaintiff is a Town located in Berkshire County Massachusetts.

59. Venue is also proper in Berkshire County because Defendant GE has a regular place of business located in Massachusetts.

8

60. Venue is also proper in Berkshire County because defendants Monsanto, Solutia and Pharmacia have regularly conducted business in Berkshire County through their sale, distribution, shipment, and placement of their products including PCBs into and throughout Berkshire County.

## **LIABILITY OF GENERAL ELECTRIC**

61. The Attorney General of Massachusetts Scott Harshbarger convened a public meeting in Western Massachusetts on February 5, 1998 to discuss with the public "concerns relating PCB contamination in Pittsfield and Western Berkshire County. The Attorney General summarized in his report the concern of the residents of Western Berkshire County with cancers possibly caused by exposure of residents to PCBs. (*DJ-28*).

62. The United States of America on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), the State of Connecticut and the Commonwealth of Massachusetts filed a Complaint in Federal Court against General Electric in 1999, pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 42 U.S.C §§ 6928 and 6973, Sections 3008 and 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U S C §§ 6928 and 6973, and other federal statutes. The Complaint sought "inter alia (1) reimbursement of costs incurred and to be incurred by EPA and the Department of Justice for response actions with regard to the GE-Pittsfield/Housatonic River Site ("Site"), together with accrued interest, (2) performance of studies and response work by the defendant at the Site and (3) damages for injury to, destruction of, or loss of natural resources, and for costs of assessing natural resource damages together with accrued interest. (*DJ-26*).

63. In accordance with the National Contingency Plan ("NCP"), 40 C F  300 and Section 121(f)(1)(F) of CERCLA, 42 U S C § 9621(0(1 )(F), EPA notified the Commonwealth of Massachusetts and the State of Connecticut "of negotiations with the General Electric Company regarding the implementation of the response actions

for the Site, and provided both States an opportunity to participate in such negotiations and be party to a possible consent decree. (I*d*.)

64**.** The Commonwealth of Massachusetts and the State of Connecticut filed complaints against the defendant in this Court alleging that the defendant is liable to both States under Section 107 of CERCLA, 42 U.S. C.  9607 and M G.L. c. 21E for, inter alia (1) reimbursement of costs incurred and to be incurred by the both States for response actions with regard to the Site, together with accrued interest, (2) performance of studies and response work by the defendant at the Site, and (3) damages for injury to, destruction of, or loss of natural resources, and for costs of assessing natural resource damages, together with accrued interest. The States' action was consolidated with the United States Action. Civil Action 99-30225, 30-226 and 30227actions and were eventually resolved by an agreed Consent Decree in the year 2000. (*Id*.).

65.  After 16  years of study and litigation against GE regarding whether and to what extent PCBs could be removed from the Housatonic River and Western Berkshire County EPA entered an Order ("Order 2016") which according to EPA reduced the presence of the toxic product—polychlorinated biphenyl's "PCBs" —from a 100-mile portion of the Housatonic River "River" which flows through the City of Pittsfield "City" and the Massachusetts Towns of Lee, Lenox,  Stockbridge,  Great Barrington, and Sheffield. (Emphasis *DJ-1*).

66.  The EPA CERCLA Order of 2016 *(DJ-1)* stated as follows:

> *The United States Environmental Protection Agency ("EPA") is charged with enforcing federal environmental laws to protect human health and the environment. Under this authority, EPA seeks to hold General Electric Company ("GE") accountable for contaminating over a hundred miles of the Housatonic River system (an area referred to as "Rest of River") with toxic polychlorinated biphenyls ("PCBs"). From 1998 to 2000, the United States, the Commonwealth of Massachusetts, the State of Connecticut, and GE negotiated a Consent Decree ("the Decree" or "CD") requiring GE to clean up its contamination. **The Decree was approved by a federal court on October 27, 2000. GE committed to clean-up the Rest of River based upon the remedy selected by EPA through the process outlined in***

*the Decree. (Statement of Position of EPA, February 29, 2016. (Emphasis here only. Exhibit DJ-1. at page-1. Hereinafter DJ number at page number.)*

67. EPA used its scientific and technical expertise to issue the 2016 remedy to address the contamination of the Housatonic River as it flows through the City of Pittsfield and the Towns of Lee, Lenox, Great Barrington, Stockbridge and Sheffield stating as follows:

*EPA has followed this exhaustive remedy selection process, which has included over a decade of expert information-gathering and technical analysis, to make its Intended Final Decision for the Rest of River remedy. EPA reached its Intended Final Decision based upon an analysis of the relevant criteria in the Decree and information in the Administrative Record. The remedy EPA selected includes a **combination of excavation and capping of PCB contaminated material, and disposal of that material at a suitable off-site landfill.** In balancing the relevant factors under the Decree, the Intended Final Decision represents the **best alternative to protect human health and the** environment for the Housatonic River. **GE now challenges EPA's Intended Final Decision for one reason – to reduce its costs in cleaning up its PCBs**. (Id. p1. Emphasis here only).*

68. EPA made the substantive decisions on all human health related issues caused by the contamination of the Housatonic River and its floodplains which resulted in a plan to transport and bury the PCBs dredged from the River at an **off-site** location.] (*Id. at pages 15-27*).

   a. *The Proposed Remedy Provides Long-term Protection of Human Health and the Environment. (Id. page 15).*
   b. *EPA's toxicity values for PCBs are supported by scientific consensus and were vetted through public comment and peer review. (Id. pages 15-17).*
   c. *The proposed remedy is necessary to reduce human exposure to PCBs through consumption of fish. (Id. pages 17-19).*
   d. *The direct contact exposure assumptions for sediment and floodplain soil in the HHRA [*Human Health Risk Assessment |EPA] *are reasonable estimates of risks to average and high-end users. (Id. pages 19-20).*
   e. *The proposed remedy is necessary to reduce human health risks due to direct contact exposure to PCBs. (Id. pages 21-23).*
   f. *PCBs pose unacceptable risks to the environment in Rest of River. (Id. pages 21-23).*
   g. *The remedy's long-term benefits to human health and the*

*environment outweigh any short-term ecological impacts which GE is required to mitigate. (Id. ps. 23-26).*

69. The position of the EPA as per was appealed by GE to the Environmental Appeals Board "EAB" who **reversed** the position of EPA on its restriction that PCBs dredged from the River must be buried at an **off-site** location. *(DJ-1 at pg.-1 Supra MF-6).*

70. GE submitted to EPA a Pre-Design Investigation of a projected PCB dump to be located in the Town of Lee "Lee" where the dredged PCBs would be buried. (*GE's Document DJ-2).*

71. EPA, forced by EAB's order to bury PCBs at an <u>**on-site**</u> location adopted GE's submission and issued a final Order in ("CERCLA Order 2020") for GE to move forward with the partial clean-up of the Housatonic River, its floodplains and other locations and to bury PCBs at the GE proposed location in Lee. (*EPA Document DJ-3).*

72. EPA was  forced to agree to bury the dredged PCBS in Lee merely to lower the cots GE's clean-up. (*DJ-1 at pg.-1).*

73. EPA, GE, the City and the towns of Lee, Lenox,  Stockbridge, Great Barrington, and Sheffield entered into a Settlement Agreement under which the City and towns agreed **only not to appeal** the EPA terms of the 2022 CERCLA Order 2020 to the courts in exchange for GE paying the City and Towns the sum of 62 million dollars to be divided among them. (*DJ-16, DJ-17).*

74. The CERCLA ORDER 2020 was appealed by citizens groups to the District Court and eventually to the First Circuit Court of Appeals. The Court of Appeals upheld the CERCLA Order 2020. (*Housatonic River Initiative v. United States EPA, 75 F.4th 248; 2023 U.S. App. Lexis 18977 July 25, 2023).*

75. There is nothing in the plain reading of Settlement Agreement that prevents Lee from filing this lawsuit for damages against GE and Monsanto for the common law damages these corporations have inflicted on the Town of Lee and its residents.(DJ-16).

76. This lawsuit filed by the Town of Lee against Monsanto and GE does not, cannot, and will not, interfere in any way with the CERCLA Order 2020 or the Settlement Agreement and GE and EPA can carry out the terms of CERCLA Order 2020 as if this Complaint had never been filed. (Complaint ¶ 14).

77. The EPA CERCLA Order 2020 Order is binding on the Town of Lee regardless of whether Lee agreed or disagreed with the Order, and cannot be overturned by municipal or local actions  or by this Court as it has already been approved by the Court of Appeals of the First Circuit. (See legal analysis in accompanying Memorandum in Support of Motion for Partial Summary Judgment.)

78. The CERCLA Order 2020 includes construction of a PCB dump in Lee the poorest town in the region. (*DJ-3).*

79. The PCB dump could have been created within the confines of the other affected towns; Lenox, Great Barrington, Sheffield or Stockbridge, however these towns are wealthy and in the opinion of the Town of Lee it considering the already significant community opposition to a PCB dump it would have been [far more difficult politically for GE to install, and for EPA to  approve a PCB dump within the confines of these towns.

80. The monies  paid by GE as per the Settlement Agreement are not compensation for anything other than the towns not appealing the CERCLA Order—as per the content of the agreement—since of the 62 million paid by GE  25 million were allocated to Lee and 25 million were allocated to Lenox.  Lenox the wealthy Town north of Lee does not have to suffer damages from a PCB dump like Lee. (*DJ-17 and DJ-16)*

81. The decision by EPA to order the construction of the PCB dump in Lee saves GE the expense of transporting dredged PCBs to an out of state accredited toxic dump as EPA's scientists and engineers recommended in the 2016 CERCLA Order. (*DJ-1 at pg. 1*).

82. The Town of Lee and its residents have suffered and will continue to suffer damages from the contamination of the River and its consequences including the massive PCB dump to be built in Lee to house the dredged PCB mud. (*DJ-15*).

83. The Settlement Agreement does not prevent The Town of Lee from seeking monetary compensation from GE and Monsanto for common law damages that PCBs have inflicted on the Town and its residents. (DJ-16 and DJ-17).

84.

## LIABILITY OF MONSANTO, SOLUTIA AND PHARMMACIA

85. Monsanto manufactured all PCBs currently in the River and Western Berkshire County of Massachusetts. (General Electric 1971 Document. ( *DJ-29 at pg. 2)*.

86. This lawsuit against Monsanto and GE does not, cannot, and will not, interfere with the CERCLA Order or the Settlement Agreement. (*Supra MFs-15 to 22*).

87. General Electric, a customer of Monsanto, used PCBs Aroclors 1254 and 1260 made by Monsanto on electrical transformers it serviced in Pittsfield ("City") between 1930 and 1979. (General Electric Document. (*DJ-29 at pg. 8*).

88. Aroclors 1254 and 1260 were sold by Monsanto for use in transformers under the trade name of "Askarels" and were marketed to General Electric under the trade name of "Pyranol." (*Id at pgs. 7 to 9.)*

89. PCBs used in electrical transformers lost its insulating properties after some usage, at which time GE collected and disposed of the PCBs by burying them in the City at various locations or by dumping the PCBs into the Housatonic River "River" that runs through the City and the towns of Lenox, Lee, Great Barrington, Sheffield and Stockbridge. (*DJ 1 and DJ-2)*

90. EPA and GE have decided under CERCLA to dredge a portion of the PCBs in the Housatonic River depositing 50.5 tons (*AKA 101,100 pounds)* of PCBs in a massive dump within the confines of Lee. (*DJ-2, DJ-3 and DJ- 15.)*

91. According to EPA the dredging of PCBs imbedded in mud at 25 ppm concentrations of  25ppm will require truck transportation of two million tons of mud (AKA four billion pounds of mud) through the streets of Lee for the next 13 years. *(DJ-15).*

92. The PCBs left on the sediments of the river after completion of the dredging of the River —anywhere between 100,000 to 500,000 pounds of PCBs— will be covered by EPA designed covers that will have to be monitored for the next 20 years–after the dredging is completed. *(DJ-24 Fast Facts and DJ-3 pages 18 et seq., as well as samples of EPA type covers. DJ-33 and DJ-34.).*

93. Monsanto manufactured the 59+ million pounds of PCBs GE purchased from Monsanto between 1972 and 1977. (*DJ-30 at pg.17  also Case: 4:23-cv-00204-HEA Doc. #: 53-2 Filed: 03/21/23 Page: 21 of 75 Page ID #: 3864*

94. Monsanto knew at all times between the 1930s  and 1977 that PCBs were toxic. *(Monsanto's Statement of Material Facts.  Document. DJ-4)*.

a. Polychlorinated biphenyls (PCBs) are a class of 209 nonpolar chlorinated hydrocarbons with a biphenyl nucleus on which one to ten of the hydrogens have been replaced by chlorine. Commercial PCBs were manufactured and sold as complex mixtures containing multiple isomers (congeners) at different degrees of chlorination. Exhibit DJ-4 Monsanto's Statement of Facts in Town of Westport et al., v Monsanto C.A. 14-CV-12041. DJ-4  at p. 1. Citations Omitted).

b.  Monsanto Company began the manufacture and sale of PCB mixtures in 1935 when it purchased the Swann Chemical Company. The Monsanto PCB mixtures were sold under the registered trademark of Aroclor. The Monsanto PCB-containing Aroclor numbers included 1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, and 1268. With the exception of 1016, the last two digits of the Aroclor series number correspond to the percent of chlorine. (Id at p 2 Citations Omitted).

c. Beginning in the 1930s, Monsanto commissioned hundreds of toxicological tests of PCBs from leading institutions such as the Harvard School of Public Health and the Kettering Institute of the University of Cincinnati. Those tests disclosed that PCBs, like all industrial chemicals, were capable of causing systemic toxicity at high doses, but could be safely manufactured, and, if recommended precautions are followed, can be used safely.  At all times relevant to this case, Pharmacia [AKA Monsanto] supplied Aroclor product bulletins and warning labels to each of its customers. These bulletins contained then-known toxicological information regarding exposures to PCBs and information on their safe handling. These bulletins also provided physical and chemical characteristics for the Aroclors. Pharmacia also issued warnings on its labeling for barrels and tank cars. Pharmacia warned its customers: "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. This warning was repeated in a 1943 application data bulletin, in which Pharmacia warned: "Experimental  work on animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Pharmacia provided the following warning: "The vapors emitted by Aroclor 1248 heated to elevated temperatures are injurious to the liver on prolonged exposure and should not be breathed. Pharmacia warned: "If these precautions are neglected acne may develop and excessive exposure may cause liver damage. (id. p-9-10.

d. PCB production in the United States began in response to the electrical industry's need for improved dielectric insulating fluids which would also provide increased fire resistance when used in transformers and capacitors. **As the unique functional characteristics of these materials became more fully understood additional uses were found. Their non-flammability made them an excellent choice in high pressure hydraulic**

> *applications associated with high risk of fire such as die casting and steel production. Their thermal stability and nonflammability were valuable in heat transfer systems.* Their non-flammability, thermal stability and viscosity characteristics made their use desirable in hot melt adhesives and other plasticizer applications. ***PCBs therefore evolved as unique class of chemicals which met important needs for both industry and society***. In many instances fire and building codes required PCBs for the protection of life and property.(Id at ps. 4-5 Citations Omitted. Emphasis here only).
>
> e.  ***In 1970, in response to growing information regarding PCB's environmental presence, Monsanto began to voluntarily phase out the sale of PCBs for various applications. Sales of PCBs for use as plasticizers were phased out as of August 1970. Monsanto had ceased the manufacture and sale of PCBs for all uses other than as a dielectric fluid for use in enclosed electrical equipment. Monsanto voluntarily ended the manufacture and sale of PCBs for all uses in 1977.***

95. Monsanto's medical team knew in 1955 that PCBs are toxic and can cause liver disease in humans, yet it halted further evaluation of the limits of exposure.  (*DJ-5 Monsanto's Document September 20, 1955).*

> *MCC's position can be summarized in this fashion. We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an Individual develops any type of liver disease and gives a history of Aroclor exposure. I am sure the Juries would not pay a great deal of attention to MACs.[Minimum Allowed Concentrations](DJ-5 at p.-1).*
>
> *We, therefore, review every new Aroclor use from this point of view. If it is an industrial application where we can get air concentrations and have some reasonable expectation that the air concentrations will stay the same, we are much more liberal in the use of Aroclor. If, however, it is distributed to householders where it can be used in almost any shape and form and we are never able to know how much of the concentration they are exposed to, we are much more strict. No amount of toxicity testing will obviate this last dilemma and therefore I do not believe any more testing would be justified.* (Id at p-2).

95. In spite of Monsanto's protestations the United States Navy rejected in 1956 a PCB (Pydraul 150 (AKA Aroclors 1254 mixture with 1260) marketed by Monsanto for usage as oil in the antenna of nuclear submarines because it was concerned by its toxic effects.

(Monsanto's Document DJ-6 May 29, 1956 and Monsanto's Document DJ-7 January 21, 1957).

> *f. applications of Pydraul 150 caused death*
> *In all of the rabbits tested , (The  amount*
> *Administered was not given.)  ...*
> *Vr: Inhalation of 10 milligrams of Pydraul 150 per*
> *Cubic meter or approximately 2 tenths of a part*
> *Of the Aroclor component per million for 24 hours*
> *A day for 50 days caused statistically definite*
> *Liver damage-.* **No matter how we discussed the**
> **Situation, it was Impossible to change their minds.**
> *(Emphasis here only. Exhibits DJ 6 and 7).*

96. Monsanto had internal dispute in 1957 as to whether Monsanto should recommend the use of Aroclor in agricultural products as an insecticide additive without approval of U.S.D.A-FDA. ( Monsanto's Document DJ-8 August 30, 1957).

> *You may already know that since Aroclor are toxic and, according to your*
> *attached reference, may extend the residual life of the pesticide, the*
> *Federal Government would require the following before selling for use on*
> *food and feed crops:*
> *(1) Proof of benefits from the application .*
> *(2) Data to show whether or not residual Aroclor  is present*
> *and whether it modifies the residual amount of Lindane or*
> *other active ingredient at harvest.*
> *(3) If Aroclor is present or if the residual quantity of Lindane*
> *or other active ingredient has been significantly changed,*
> *tolerances for the Aroclor and for the pesticide in*
> *question must be developed.*
> *(4) If a toxic quantity of Aroclor is present at harvest in*
> *food or feed crops a tolerance cannot be established until*
> *after two year chronic toxicity feeding tests have been*
> *completed for the Aroclor. (DJ-8).*

97.  Monsanto discussed internally on March 6, 1969 the actions it could take in response to the knowledge spreading around the  world that Aroclors  were an uncontrollable pollutant spreading widely by air-water. *(Monsanto Document DJ-9 March 6, 1969).*

> *Risebrough in a recent paper "Nature", Vol. 220, Dec. l4, 1968, has*
> *attacked chlorinated biphenyls in three ways:*
> *(1) a pollutant - widely spread by air-water; therefore an uncontrollable*
> *pollutant.*
> *(2) a toxic substance - with no permissible allowable levels*
> *causing extinction of peregrine falcon by induced hepatic*

*enzymes which degrade steroids upsetting Ca metabolism leading to reproductive weakness, presumably through thinner egg shells.*
*3) a toxic substance endangering man himself; implying that the peregrine falcon is a leading indicator of things to come.(Id. at page-1)*
*\*\**
*Where does this leave us?*
*Under identification and control of exposure - we will be able to identify and analyze residues as well or better than anyone in the world. We will probably find residues other than BBT and PCB's. We will probably wind up sharing the blame in the ppm to ppb concentration level. We can take steps to minimize pollution from our own chlorinated biphenyl plants, we can work with our larger customers to minimize pollution, we can continue to set up disposal and reclaim operations.*
*We can work for minimum exposure in manufacture and disposal of capacitors, transformers and heat transfer systems, and minimize losses for large hydraulic users. (Id. p.-2)).*

98.  Monsanto discussed a report on April 2, 1969 of comments on PCB tests conducted at Industrial Biotest Laboratories in Chicago. *(Monsanto's Document DJ-10 March 21, 1969).*

   a.  *From the background data presented it appears that something of the order of 80 million pounds of polychlor biphenyls (PC3) are produced annually.(Id. p-1).*
   b.  *At first thought it seems unlikely because of the major uses of PC3 in capacitors, transformer oils, heat transfer fluids in closed systems, that these materials could be the source of the substantial degree of environmental contamination reported. (id. p-1).*
   c.  *Because of the apparent high stability of PCB, amounts entering the environment would be degraded very slowly and it seems possible that at least 10 million pounds annually may become environmental contaminants. Since the PCBs were introduced commercially in 1929 there have been 40 years of production. If this has averaged 50 million pounds per year, then about [2 billion] pounds have been made and perhaps {200 million pounds] have entered the environment. Because of the apparent stability of these compounds most of this amount nay still be circulating in the global ecosystem and this is suggested by the levels reported by Holmes et al. (1967) and Risebrough et al. (I968) in animal tissues which are quite comparable to those found for DDT.(Id.-p.1)*
   d.  ***It seems to the writer that the evidence regarding PCB effects on environmental quality is sufficiently substantial, 0idespread, and alarming to require immediate corrective action on. the part of Monsanto.** (Id. p-2. Emphasis here only).*

19

99. Monsanto's Plasticizer Group sent a letter to its 661US customers of Aroclors 1254 and 1260 on February 27, 1970 regarding published articles indicating that PCBs have been discovered at some points in some marine, aquatic and wildlife environments. … the quantities detected are said to be in the parts per million and parts per billion categories. *(Monsanto's Document and Attachments. DJ-11 January 27, 1970).*

> *Dear Customer:*
>
> *Recently several newspaper and magazine articles have been published indicating that polychlorinated Biphenyls ( PCBs have been discovered at some points in some marine, aquatic and wildlife environments. The quantities detected are said to be in the parts per million and parts per billion categories.*
>
> *It is claimed that the PCBs found strongly resemble chlorinated biphenyls containing 54% and 60% chlorine by weight. Products sold by Monsanto under the trade names of Aroclor 1254 and 1260 containing chlorinated biphenyls.*
>
> *As your supplier of Aroclor 1254 and 1260, we wish to alert you to the potential problem of environmental contamination is referred to In the newspaper and magazine articles.*
>
> *We would like to point out the following additional facts.*
>
> *1. Certain Monsanto products which are sold under the Aroclor trade mark, namely Aroclor 5060, 5442, and 5460 are not polychlorinated biphenyls.*
>
> *2. PCBs with a chlorine chorine content of less than 54% have not been found in the environment and appear to present no potential problem to the environment.*
>
> *We feel that all possible care should be taken in the application, processing and effluent disposal of these products to-prevent them becoming environmental contaminants. Of interest to you may be an article in Chemical Week , October 29, 1969 regarding water pollution standards set by each state of the Union. It is attached. **This article reflect the view that good manufacturing practice in the-future may require that no products used by any company be lost or discharged in such a manner as to ultimately be found in waterways.***
> *(Id. at ps. **1-2.** Emphasis here only).*

20

100.   The warning sent to 661 customers of Aroclors 1254 and 1262 diluted the issue by
       incorporating the Chemical Week article, which listed possible future regulatory
       work by each state, and stating that their warning was issued because of recent
       published articles **implying that was all Monsanto knew about PCBs toxicity
       and its impact on humans, fish, birds and he environment.**  (*Id*. Emphasis here
       only).

   The Chemical Week article sent by Monsanto to its customers makes the
   following points:

   a.   "large chemical complexes now in vogue make water-and lots of it- a
        major site criterion. … That means locations on or near the big,
        drought-resistant rivers. … There are less than 200 rivers in the U.S.
        with minimum flows over 50 cu. ft per second."
   b.   The price tag for pollution control is high. … A recent WPCA study
        estimated that water waste treatment facilities can increase installed
        capital equipment costs 40% or more.
   c.   The article makes no suggestion to General Electric or any other
        customer not to dump PCBs in the Housatonic River, the Hudson
        River or any other river. Exhibit-DJ-11 Chemical Week Article.
        Exhibit-DJ-11).

101.   Monsanto's Plasticizer Group sent the letter dated February 27, 1970 to 661
       customers who used Aroclors 1254 and 1260 as plasticizers warning of
       contamination of the environment.  (*DJ-4*)

   Three GE facilities received the letter: (*DJ-4).

   a.       Customer 248 GE Coshocton Ohio.

   b.       Customer 249 GE 1430 E. Fairchild St. Danville Ill.

   c.       Customer 250 GE 1 Plastic Avenue Pittsfield Mass.

102.   Monsanto's Plasticizer Group failed to notify GE's Transformer's Division of any
       possible problem with environmental contamination of the River. (*DJ-4*)

103.   Monsanto's  letter suggested  to its 661 plasticizer's customers "that all possible
       care should be taken in the application, processing and effluent disposal of these
       products to prevent environmental contamination." (*DJ-4, 2*).

104.  Monsanto's Plasticizer Group's letter to its plasticizers customers dated February 27, 1970  was nothing more than an attempt to create post facto protection of liability,  since five months later in August of 1970 Monsanto ceased marketing Aroclors 1254 and 1260 as plasticizers. ([**MF-32** at *(e)*.]

105.  Monsanto knew much more about the unique problem of PCB contamination of rivers in 1968. This knowledge was unique to Monsanto. Monsanto kept this this information secret to prevent customers like GE from terminating its usage of Aroclors 1254 and 1260 as transformers fluids which continued for ten more years. *(Among hundreds of Monsanto documents introduced in other lawsuits against Monsanto, Counsel has found no evidence that Monsanto ever acknowledged this knowledge).*

106.  Monsanto never told GE or any other of its 661 plasticizer's  customers of Aroclors 1254 and 1260 that dumping PCBs into a River resulted **in permanent PCB contamination of the rivers due to the unique properties of PCBs  (See MF-44, 45 and Monsanto Documents that follow).**

107.  Monsanto established in 1969 an Aroclor "Ad Hoc" Committee to set business objectives for the company and to discuss its current knowledge of the impact of Aroclors on humans, fish, birds  and the environment. (*Minutes of Aroclor :Ad Hoc" Committee Monsanto's Document  DJ-12 September 5, 1969.)*
    *MINUTES OF AROCLOR "AD HOC" COMMITTEE. ).*
    *First Meeting*

    *Date: September 5,  1969*
    *Present: M. W. Farrar*
    *P. B. Hodges, Secretary*
    *E. V. John*
    *W. H. Richard .*
    *E. P. Wheeler, Chairman*

    *Objectives: (Agreed to by the Committee)*

*Submit recommendations Tor action which will:*
*1. Permit continued sales and profits, of Aroclors and*
*Terphenyls.*
*2. Permit continued development of uses and sales.*
*3. Protect image of Organic Division and of the Corporation.(Id-p-1).*

*Background Discussion of Problem:*
*1. Agreed that we should concentrate on Aroclor 1254 and*
*1260. ...(Id at p-1)*

*2. - PCB has been found in:*
*a. Pish, oysters, shrimp, birds.*
*b. Along coastlines of industrialized areas such as*
*Great Britain, Sweden, Rhine River, low countries.*
*Lake Michigan, Pensacola Bay, in Western wild life*
*(eagles). It may be a global contaminant.*
*3. PCB has been tied to DDT in effects on disappearance of*
*wild birds which have fish diets. Ratio of PCB to ddt*
*has been about 4o-50:1 generally. Dr. Reisboro (sic) reported*
*almost 1:1 ratio. PCB may be contributing to or exaggerating the effects*
*of other chlorinated aromatics. (Id.-p-1).*

Escambia River Problem:

*For a clearer understanding of the general problem, -*
*the situation at Pensacola was reviewed.* ***From a relatively***
***negligible discharge of 1-3 gal/day into a large***
***river, 1/5 mile downstream levels of 42 ppb in water***
***and 476 ppm in mud were found.*** *Although use of Aroclor*
*was halted Immediately,* ***we can expect the water contamination to***
***continue for a lengthy period by leaching from the contaminated mud.***
*No downstream samples have yet been taken to measure the decrease in*
*contamination (as of 9/3/69). Id. at ps. 1-2. Emphasis here only) .*

108.  The "Escambia River Problem was not knew to Monsanto on September 5, 1969.
      In fact, it was problem that Monsanto understood would have devastating
      consequences for its 1254 and 1260 Aroclor business as early as 1968 or earlier
      when the Escambia River problem was discovered by Monsanto. (*Monsanto's*
      ***CONFIDENTIAL*** *Report of Aroclor "ADD HOC" Committee October 2, 1969*
      *DJ-13*):
      *Losses from Monsanto Plants (DJ-13)*

      *Efforts to reduce the losses of Aroclors in liquid wastes from Anniston and*
      *WGK plants are completed or underway.* ***It is impossible to establish a***
      ***limit as to what can be discharged "safely". Investigation has shown***
      ***that the waters in receiving streams below the Anniston Plant contain***

**significant (parts per million) concentrations of PCB. More ominous perhaps is the fact that sediment in the bottom of these streams miles below our plants may <u>contain as much as 2% Aroclor.</u>** *(Exhibit DG-13 at p. 8. Emphasis here only).*

**To prepare for the eventual publication** *in the press of the discharge of PCB's (sic) in Alabama and to the Mississippi River, a significant an effort must be made to determine the present levels of contamination and more importantly, determine the levels of contamination as "clean up" procedures begin to show an effect. (Id. p. 8 Emphasis here only. ).*

**The incident at the Monsanto plant at Pensacola indicates that all Monsanto Plants using Aroclors should be made aware of the potential problems and efforts made to eliminate any losses. The significance of "any losses" may be related to the one to three gallons per day which was being lost at the Pensacola Plant.** *(Id. p. 8 Emphasis here only).*

**Hopefully research efforts will indicate what a "safe level " of losses would be higher in fresh water streams not adjacent to coastal estuaries. At the present time we know of no claims that the PCB's (sic) are "destroying" fish**. *(Id. at p.9. Emphasis here only).*

109. The  Escambia River drains 425 square miles in Northwest Florida before flowing into Pensacola Bay at an average  rate of 9,900 cubic feet per second.[1]

110. The Housatonic River flows through Pittsfield, Lenox, Lee, Great Barrington, Sheffield and Stockbridge at an annual average rate of 1,700 cubic feet for second.[2]

111. Monsanto has apparently failed to introduce any evidence in the myriad of lawsuits it is defending in this country that it ever acknowledged to the world or to any of its customers, including GE, that it had learned from the Escambia incident that their

---

[1]

https://www.google.com/search?client=safari&rls=en&q=ESCAMBIA+RIVER+AVERAGE+CFS&ie=UTF-8&oe=UTF-8

[2]

https://www.google.com/search?client=safari&rls=en&q=Housatonic+River+Average+CFS&ie=UTF-8&oe=UTF-8

Aroclors 1254 and 1260 used in transformers, unlike all other chemicals dumped into rivers by manufacturing industries, did not flow to the sea but remained imbedded in the sediments of the rivers. *(Monsanto's DJ-11 Chem. Week Article).*

112.  Monsanto did act in August 1970 by suspending production of PCBs for plasticizer usage. *(Monsanto's Statement of Material Facts. Document. DJ-4 at ¶ 7).*

113.  Monsanto sold PCBs to GE from 1930 to 1977 for use in electrical transformers assembled and/or serviced by GE in Pittsfield Massachusetts. *"( DJ-30 pgs. 34 and 35; ; Document Filed by Monsanto in Monsanto v. GE 4:23-cv-00204 P   Page ID # 88 and 89.).(See also DJ-1, DJ-2 and DJ-3). Id.*

114.  Monsanto knew that GE's transformer facility was located in Pittsfield adjacent to the Housatonic River. (*Id*).

115.  Monsanto knew or should have known that GE disposed of used PCBs by dumping them into the Housatonic River or by burying them in landfills created by GE in Western Massachusetts.  *(DJ-1, DJ-2 and DJ-3)*

116.  Summarizing the Chemical Week article this is what Monsanto told its customers in 1970:

> *This article reflect the view that good manufacturing **practice in the-future** may require that no products used by any company be lost or discharged in such a manner as  to ultimately be found in waterways.(Monsanto's Letter to Customers 1970 DJ-11 Emphasis here only). ).*

117.  GE dumped into the Housatonic or buried in landfills more than 1.5 million pounds of PCBs between 1930 and 1979 according to Ed Bates of General Electric.  ( *See Documentary  Good Things to Life: GE, PCBs, and Our Town, Mickey Friedman Director/Producer.* (Open Source You Tube Documentary*).* EPA's estimate of the amount on the River sediments is between 100,000 and 600,000 pounds (*DJ-24 Fast Facts*).

118. Between 1972 and 1977 Monsanto sold General Electric more than 59 million
     pounds of PCBS. (*DJ-30 at pg. 17.  Monsanto v. General Electric 4:23-cv-00204
     Doc. #. 1-3 Filed 02/20/23 Page ID #.3864*).

119. The discrepancy between [the] Bates and EPA estimates, and the 59 million pounds
     Lee has learned that GE purchased from Monsanto between 1972 and 1977 are
     better understood by a number of facts disclosed by Monsanto:

   a. *"**Approximately five per cent of the transformers in service in this
      country contain PCBs; most transformers contain mineral oil
      instead of PCBs.**" (DJ-32 pg.-4; EPA's 1976 Document Filed by
      Monsanto in in Monsanto v. General Electric et al, 4:23-cv-00204
      Page ID# 4362 Emphasis here only).*
   b. *"General Electric and its products have been a major source of
      environmental contamination and have released PCBs purchased both
      before and after the January 31, 1972 into the environment"( DJ-30
      Pg. 34; Document Filed by Monsanto in Monsanto in v. GE 4:23-cv-
      00204 Page ID # 88).*
   c. *"General Electric facility in Oakland California served as a
      transformer manufacturing plant from 1930 to 1975. ... The State of
      California ... found that the soil and groundwater around General
      Electric's transformer manufacturing plant in Oakland California
      were contaminated with PCBs."( Id).*
   d. *"General Electric cause significant contamination of the Hudson
      River, now one of the largest superfund sites in the United States. ...
      "GE facilities, one in Fort Edwards, New York, and one in Hudson
      Falls New York, used PCBs in the manufacture of electrical
      capacitors. PCBs from both facilities were discharged into the Hudson
      River. ..." (Id.*
   e. *"**From 1932 to 1977, General Electric manufactured and serviced
      transformers containing PCBs at its Pittsfield, Massachusetts
      Facility. EPA has determined that years of General Electric's use
      and disposal of PCBs at this facility caused extensive contamination
      around Pittsfield as well as down the entire stream of the Housatonic
      River." "( DJ-30 pgs. 34 and 35; ; Document Filed by Monsanto in
      Monsanto in v. GE 4:23-cv-00204 P   Page ID # 8and 89.).(See also
      DJ-1, DJ-2 and DJ-3). Id.***
   f. *"General Electric is responsible for PCB contamination of Spokane
      Washington." DJ-30 pg. 35 also in Monsanto v. GE (Id) Page ID# 89.*
   g. *"General Electric is responsible for contamination in Oregon. From
      1952 until 2010 General Electric owned and operated an electrical*

*equipment service and repair facility and warehouse in Portland Oregon–approximately 3,000 feet from the Williams River. ... In 2003 testing by the City of Portland revealed that PCBs from sediments near the General Electric facility were discharged into the storm water system, and in turn, in the Willamette Riv." Id. Page ID # 89).*

h.  *"General Electric also stored a variety of transformers and capacitors containing BCBs at a site at 2410 N. Columbia Blvd. in Portland Oregon. Officials subsequently discovered contamination at this site as well." Id. Page ID# 89.*

i.  *"From 1970 until 1974, General Electric stored drums, transformer casings and other containers at a facility in Eugene Oregon. In 1995, testing revealed PCBs persisted in the subsurface and sludge of water samples from a storm drain at the site." Id.*

j.  *"From 1974 until 1993, General Electric had another facility in Eugene Oregon were employees washed and cleaned equipment including transformers. Water from these cleaning facilities was directed to tanks and sumps. In 1995, testing of groundwater sludge and water samples from the site revealed PCBs above regulatory levels. Id. Page ID #s 89 and 90*

k.  *"General Electric is also responsible for PCB contamination in East Flat Rock, North Carolina. In 1994 EPA declared the 141-acre Geberaak Electric Shepard Far Site a Superfund Site. EPA placed the site on its National Priority List because of contaminated groundwater and soil." Id. ID #s 89.*

l.  *"General Electric is also responsible for extensive contamination of the soil and water surrounding its plant and other locations in Schectady New York." Id.*

m.  *"Upon information and belief, General Electric is also responsible for PCB contamination around certain other facilities, both before and after 1972, including but not limited to facilities in Washington, West Virginia, Shepherdsville, Kentucky, Moreau New York, Rome, Georgia, Brandon, Florida, Anaheim, California." Id. Page ID#.91.*

120.  In the late 1960s, PCBs were found to persist in the environment. *(DJ-30 at pg. 12; Case: 4:23-cv-00204-HEA Doc. #: 1-3 53-2 Filed: 02/20/23 Page: 13 of 463 Page ID# Page ID #: 66).*

121.  On **January 21-22, 1970**, Old Monsanto representatives met with **General Electric representatives** in St. Louis, Missouri who advised Old Monsanto that without the continued manufacture and sale of PCBs for electrical plications in the United States, the domestic industry **for certain electrical devices** would shut down. (*Id. Emphasis here only*)

27

122.  **In early 1970**, Old Monsanto announced that it would phase out production of PCBs for use as plasticizers and **heat transfer fluids** in food and feed applications. *(Id. Emphasis here only).*

123.  On or about **February 18, 1970**, Old Monsanto sent letters to its Aroclor electrical fluid customers calling their attention to recent reports indicating  that  **molecules resembling the higher chlorinated products had been found in marine and wildlife environments.** The letter urged Aroclor customers to use "all possible care" to prevent Aroclor products from becoming environmental contaminants. The letter also pointed out that **it was possible for PCB-containing electrically insulating liquids to leak out of sealed electrical devices and suggested that the recipients should notify the purchasers of their electrical equipment about the problem.** *(Id. Emphasis here only).*

124.  **In March 1970**, General Electric held a full-scale internal review of the PCB situation and concluded that PCBs were a problem for General Electric and that General Electric was on notice from Old Monsanto to work on the problem and to work with its transformer and capacitor customers. General Electric sent a letter notifying its Pyranol customers about the PCB situation in May 1970. **Despite these actions, General Electric strongly objected to ending the use of Aroclors 1254 and 1260 in electrical equipment and recommended that Old Monsanto Continue to manufacture those products.** *(Id. Emphasis here only).*

125.  On or about **April 21, 1970,** Westinghouse representatives met with Old Monsanto representatives in St. Louis, Missouri. At that meeting, the Westinghouse representatives were fully advised by Old Monsanto of the background and events involving the discovery of PCBs in the environment, and received information, *inter alia*, **about the environmental risk of PCBs to certain forms of animal life**. *(Id. DJ-pgs 12 and 13. ...Page ID #s 66 and 67.  Emphasis here only).*

126. Starting in or **around April 1970**, Old Monsanto began labeling its Aroclor products, shipping documents, and invoices with a warning that extreme care should be taken to prevent any entry of PCBs into the environment. Old Monsanto also undertook efforts to obtain agreement from General Electric and Westinghouse to place similar environmental warnings on Pyranol and Interteen containers. *(Id. DJ-pgs 13. ...Page ID #s 67.  Emphasis here only).*

127. In **May 1971**, the American National Standards Institute ("ANSI") established a PCB committee, designated as C107. The ANSI C107 Committee was established at the recommendation of Old Monsanto with the objective of developing guidelines to minimize PCB environmental pollution from electric uses. Representatives from … General Electric (E. L. Raab) [were] on the ANSI C107 Steering Committee. *(Id.)*

128. In **June 1971**, Westinghouse and General Electric were instrumental in creating an industry report regarding the use and disposal of PCB dielectric fluids, which, inter alia, described the environmental problems posed by PCB dielectric fluids. *(Id.)*

129. **In September 1971,** the U.S. government convened an Interdepartmental Task Force on PCBs (the "Task Force"). The Task Force "included operating units of five Executive Branch departments," namely: the Department of Agriculture; Department of Commerce; EPA; Department of Health, Education, and Welfare; and Department of the Interior. Dept. of Agriculture, et al., *Polychlorinated Biphenyls and The Environment.* Its purpose was to coordinate the **scientific efforts of the Government aimed at understanding [PCBs], and to strengthen the Government's ability to protect the public from actual or potential hazards from PCBs." Id. (abstract). (***Id. DJ-30 pgs. 13 and 14; … Page ID 3s 67-68. Emphasis here only*).

130. In or around November 1971, ANSI established subcommittees on the use of PCBs in capacitors and transformers. Various representatives of Defendants were

members of these two committees, including … Dr. A. Pozefsky (GE), E.L. Raab (GE), … E. L. Raab (GE) was the chairman of the transformer subcommittee and Dr. A Pozefsky (GE) was the chairman of the capacitor subcommittee. These ANSI subcommittees met multiple times in late 1971 and early 1972. (DJ-30 pg 14).

131. On December 16, 1970 Edward Raab, Manager of Dielectric Systems, Insulation Systems Laboratory Operations at General Electric Transformer plant in Pittsfield Massachusetts was assigned by Mr., J, F. McAllister, Manager, Product Quality, Central Electric Co, to prepare a report describing the **alleged** essential role that polychlorinated biphenyls play in electrical transformers for submission to Dr. Edward J. Burger, Jr, of the United States Office of Science  and Technology. The report was due to be submitted to Dr. Burger by January 3, 1972.  (*DJ-29 pg. 2, also  Case: 4:23-cv-00204 Page ID # 518. Emphasis here only*).

132. General Electric stated in its report to the United States that **"it was only recently that evidence began to appear that these materials had been widely dispersed throughout the environment.** *Id*. pg-1. Emphasis here only).

133. General Electric stated in the same report  **"**The Monsanto Company has declared, however, that it will continue to sell PCB's for closed-system electrical uses. This decision is a **tacit recognition of the important role that PCB's play in the safe, reliable, and efficient delivery of electric power from the generating plant to the user.(***Id.  Emphasis here only***).

134. General Electric statement quoted in MF-72 is in direct contradiction to Monsanto's Statement cited on **MFs-62 and 64.**

135. General Electric stated in the same report. "PCBs are used by the electrical industry as components of certain types of transformers and capacitors. … and are recognized  .. by the term "askarel." " (*Id. pg. 4*).

136. Monsanto, fully aware that PCBs were harmful to humans and the environment agreed to  continue selling PCBs to GE **provided that GE indemnify Monsanto for any damages to humans and the environment resulting from GE's continuing usage of PCBs**. (*DJ-20).*

137. Monsanto as a result of its practices has been found responsible for millions of dollars of Environmental damages. (DJ-30).

.

138. Monsanto is currently suing General Electric for recovery of some of the paid-out funds on the basis of the contract entered into between Monsanto and General Electric dated January 31, 1972. (DJ-30; *Monsanto v. General Electric 4:23-cv-00204 Filed 02/20/23 Page  ID#s 55 to 125*).

139. Monsanto, in spite of its knowledge about the "Escambia River Problem", continued to sell Aroclors 1254 and 1260 to the electrical manufacturing industry. *(Monsanto's Statement of Material Facts.  Document. DJ-4 at ¶ 8).*

140. Monsanto has advocated standards of foreseeability in a case winning Summary Judgment Motion against Westport, a  Massachusetts Town in 2017. (*Monsanto's Memorandum of Law in Support of its Motion for Summary Judgment in Town of Westport v. Monsanto et al., C.A. No. 14-CV 12041. DJ-14).*

> ***To establish a failure-to-warn claim, the plaintiff must establish that the product is unreasonably dangerous because foreseeable users were not adequately warned of the foreseeable risks of harm associated with its use. Evans, 465 Mass. at 439. Massachusetts has rejected any hindsight analysis of the duty to warn. Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 23 (1998). The manufacturer's duty is limited to warning of dangers that were reasonably foreseeable at the time of sale, or could have been discovered by way of reasonable testing prior to marketing the product. Id. at 22-23. The failure to warn under breach of warranty is judged by the reasonableness of the defendant's actions under the circumstances. Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 637 (2001). Because the alleged harm at issue in this case was not reasonably foreseeable or discoverable in 1969, no duty to warn of the alleged risk arose as a matter of law.(DJ-14 at p. 6-7.)***

141. Monsanto's foreseeability standards establish that as soon as Monsanto learned that PCBs dumped in water ways did not flow with the water to the sea— **as all other chemicals did**— it had the immediate responsibility to notify all users of PCBs— and the entire world—of this unique property of PCBs. (*Id*).

142. Monsanto is jointly liable with GE for the consequences of PCBs dumped in the River by GE. One consequence of the contamination of the River with PCBs is the massive PCB dump to be built in Lee. The characteristics of the dump and how it will be constructed in the next 13 years is described by EPA in letter to counsel.

*(Letter EPA's General Counsel to Attorney Bonifaz DJ-15 November 8, 2022):*

    i.   The landfill … shall have a footprint of 20 acres. (*Id., page 5 hereinafter Id., #)*

    ii.  *It will have an elevation of "1,099 feet above mean sea level.". (Id., 5)*

    iii.  "If seasonal high groundwater elevation is determined to be higher than 950 feet above sea level the maximum elevation of the landfill … may be increased". (*Id., 5)*

    iv.  "The bottom liner of the landfill will be installed at a minimum of 15 feet above …high groundwater elevation". (*Id., 5)*

    v.  "The Upland Disposal Facility shall have a maximum design of 1.3 million cubic yards" [AKA 1.3 million tons of mud and soil since one cubic yard of soil weights approximately one ton.] (*Id. 5).*

    vi.  "The 2020 remedy involves an estimated 47,000 truck trips of excavated materials to the UDF. " (*Id. 2)*

    vii.  "The cleanup is estimated to take 13 years, so there will be approximately 3,800 tuck trips per year. … the above numbers of truck trips do not count trips for importing clean material for capping, backfilling, or the construction of the UDF. They also do not account for return trips to the River after disposal at the UDF or trips taken by trucks to the River for disposal off-site." (*Id. 2, 3).*

    viii. "The primary finding of the Desimone Report confirms what is already known and documented: … there are permeable soils underlying the UDF location. " (*Id. 2).*

    ix.  "The Notice also cites EPA guidance for the proposition that the liner system will eventually leak. 53 Federal Register 33345 (August 30,1988.) This guidance, however, does not recommend against properly designed and monitored landfills with low-permeable cover, double bottom liner, and leachate collection, such as the proposed UDF. The guidance actually recommends double bottom liners and groundwater monitoring longer than 30 years, which is what the permit requires." (*Id. 4).*

32

      x.  "Furthermore, the surface drainage from the UDF is generally away from the water supplies and towards the River. …**Thus, in sum, groundwater and surface water near the UDF flows towards the River** and away from the Town of Lee's water reservoirs." (Id. 4. Emphasis here only.).

     xi.  "The total mass of PCBs to be removed from the River is 50,500 pounds of PCBs.*(Id. 2).*

143.    Ed Bates of GE has estimated that GE dumped 1.5 million pounds of PCBs into the River between 18930 and 1979. (*supra ¶ 69*). EPA estimated in a 2020 publication that the River contains 600,000 pounds of PCBs. (*DJ-24*).  EPA in letter to counsel in 2022 estimates that GE will remove 50.5 tons (AKA 101,000 pounds) of PCBs from the River under the CERCLA Order.  Thus, the poundage of PCBs that will be left in the River after GE satisfies the CERCLA requirements ranges from 500,000 to 1.3 million pounds, all of which are damaging to Lee and its residents.  Regardless whether the amount of PCBs in the River amount to 1.5 million or 600,000 pounds, the poundage to be removed from the River is merely 100,100 pounds. (*DJ-15 p. 2*).

144.    Monsanto and GE are liable to the Town of Lee for the damages caused by the PCBs that exist in the River now, and for the PCBs that will continue to exist during the CERCLA cleanup, and the damages caused by the PCBs as the PCB dump is constructed.  And Monsanto and GE are liable to the Town of Lee for the damages that the dump will generate to Lee and its residents for years to come. (*See DJ-18 ballot Question, DJ-DJ-19 Decision of the Board of Health of Lee, DJ-21 Monsanto cancer compilation of is employees from 149 to 1970 and DJ-23 Letter from Lee to public).*

145.    The dump was question 1 on the 2022 town election ballot. The ballot question read: "Shall the town require the elect board to rescind the town of Lee's approval of the rest of River Agreement" The residents  rejected the UDF with a 665 Yes, 390 No, 47 Blanks.. (*DJ-18 Communication Town of Lee to Counsel*). Given the CERCLA Order of 2022 the Town could not comply with the wishes of the majority of Town's residents.

146.  The Board of Health of Lee found after an adjudicatory hearing that "By taking these concerns into consideration, The Lee Board of Health thereby considers that the proposed UDF may pose an increased risk to the health of the residents of Lee.(*DJ-19 Decision of the Board of Health of Lee in the matter of the PCB dump*).

147.  Monsanto kept track of  608 cancer deaths of its PCB exposed employees between 1949 and the 1970s. This remarkable tabulation is ample proof that Monsanto had concerns of cancers caused by PCBs exposure. (DJ-21)

148.  EPA concluded that leaving PCBs in the River or removing 285, 000 cubic yards (AKA tons) of sediments from Woods Pond and 60,000 cubic yards (AKA tons) in the River impoundments and moving them to Lee merely "**decreased risks to the health of Lee's residents".** In contrast, it implied by its analysis that moving the PCBs to Lee eliminated the risks of health to the very wealthy residents of Lenox, Stockbridge, Great Barrington and Sheffield. *(Letter EPA to Counsel November 8, 2022  DJ-15).*

149.  In 2023, Monsanto filed in a Federal Court a **1976 EPA** document that stated **that only 5% of the transformers in 1976 contain PCBs**. (*DJ-29 pg. 4; Monsanto v. General Electric 4:23-cv-00204 Doc. #. 1-3 Filed 02/20/23 Page ID #. 4362. Emphasis here only)*.

150.  EPA admitted in this report dated February 24 1976 that:

>   *Many, but not all, of the facets of the problem are addressed; many of the estimates presented ae based on engineering and scientific judgment instead of hard data, simply because hard data in these areas are not available. DJ-29 pg. 3; … Page ID# 4361".*

>   ***The major conclusion from this portion of the study was that technically acceptable alternatives to the use of PCBs of transformers exist and that their use should not result in a significant increase in fire hazards from transformer failure.***

*At present the selection of PCB (Askarel) transformers appears to be based primarily on cost rather than technical considerations. (DJ-38 at pg-18). (Emphasis here only).*

151. Monsanto abruptly ceased manufacturing and marketing PCBs for the electrical industry one year later in 1977. (*MF-31 at e*)

152. There is no evidence anywhere that conversion to mineral oil of the 5% PCB transformers manufactured or repaired from 1972 to 1977 in Pittsfield Massachusetts—or anywhere else in the in the United States—disrupted electrical services in the United States.

## DAMAGES THE TOWN OF LEE WILL BE SEEKING AT TRIAL FROM DEFENDANTS THROUGH THIS LAWSUIT

153. The Town of Lee is seeking from Monsanto and GE adequate compensatory and punitive damages for the harm both companies intentionally caused to Lee by creating profits for their shareholders without justification.

154. Those damages include eliminating the use of the River for all Town's residents for years to come.

155. As ordered by EPA In the forthcoming 13 years two billion pounds of PCB contaminated muds and soil will be dredged from the River by GE and transported in eighty-thousand-pound truck loads through the streets of Lee, and deposited within the confines of the Town of Lee in a dump projected to be 150 feet in height on a 20-acre base. Under EPA estimates Five hundred thousand pounds of PCBs will be left in the sediments of the River by GE under EPA estimates. (*DJ-3, DJ-15, DJ-33, DJ-34*).

156.  The sediments in the River will then be covered by a tarp with potential leakage of PCBs and will require monitoring for twenty years after completion of the partial dredging. (See tarp samples EPA is requiring GE to install under the CERCLA 2022 Order. (See *DJ-33 and DJ-34*).

157.  The Town Lee is seeking, as *parens patriae* on behalf of its residents adequate compensatory and punitive damages to be determined by a jury for the catastrophic disaster Monsanto and GE have caused to Lee.

158.  The CERCLA Order of 2022 cannot and does not require Monsanto and/or  GE to pay damages to the Town for the intentional actions of GE and Monsanto that have caused and will continue to cause harm to humans and the environment.

159.  EPA has no jurisdiction over Monsanto in this matter as Congress restricted EPA jurisdiction to the immediate actor that contaminated the soil and the River– in this case GE.

160.  Monsanto knew as far back as the 1930s that PCBs were toxic to humans and the environment. (*Supra passim*).

161.  The Town of Lee upon publication of the contamination of the Housatonic River by GE with PCBs in the 1980s and 1990s relied on EPA to force GE to restore the River and its banks to its original estate.

162.  As Monsanto learned in 1968 from a negligent event, the task imposed on EPA by CERCLA turned out to be impossible given the nature of forever life of PCBs as Monsanto learned in 1968 from an admitted negligent event. (*Supra ¶¶s- 105-111*)

163.  The CERCLA Order of 2022 is at best a weak compromise of what EPA could do under the circumstances to reduce the risks to humans and the environment.

164.  In early 2023, cases filed across this country against Monsanto for contamination of water- ways made the Town of Lee aware for the first time that Monsanto was jointly liable with GE for PCB related damages.

165.  Cases and settlements for contamination of water-ways mostly filed by attorney generals of states like Oregon and Pennsylvania against Monsanto provided the Town with a flood of internal Monsanto documents that became available through the dockets of the cases.

166.  On November 10, 2023 the Town in good faith provided documentation to GE that would allow GE to seek compensation from Monsanto for all monies it had spent and was about to spend under CERCLA Orders for the dredging of the Housatonic and Hudson Rivers.(*DJ-22*).

167.  The basis for GE's possible action against Monsanto was Lee's assumption that GE did not know that in 1968 Monsanto learned through a "negligent event"— Monsanto's words —that PCBs in the Hudson and Housatonic River did not flow with water currents to the Atlantic. (*Id.*)

168.  GE's lack of response to Lee's generous letter generated the Town's interest and sought from lawyers associated with similar cases further documentation on the matter.

169.  On December 15, 2023, the Town was provided with the afore mentioned contract (DJ-20) between GE and Monsanto. (DJ-20, *DJ-25).*

170.  The statute of limitation of the Town of Lee against Monsanto and GE for intentional infliction of harm to humans and the environment begins to run on December 15, 2023 the date Lee obtained the Monsanto-GE contract. (*id*.)

**THE SETTLEMENT AGREEMENT NOT TO CHALLENGE THE
CERCLA ORDER AND THE CONTRACT BETWEEN MONSANTO
AND GENERAL ELECTRIC**

171.   EPA, GE, the City of Pittsfield and the towns of Lee, Lenox, Stockbridge, Great
Barrington, Sheffield, the Audubon Society and others entered into an agreement
**not to appeal** the CERCLA Order issued by EPA in 2022 in exchange for 62
million dollars to be paid by GE to the participants. (*DJ-16, DJ-17).*

172.   There is nothing in the plain reading of Settlement Agreement that prevents Lee
from filing this lawsuit for damages bases on common law against GE and
Monsanto for the damages these corporations have inflicted on the Town of Lee
and its residents.

173.   The afore mentioned Agreement was appealed by citizens groups to the District
Court and eventually to the First Circuit Court of Appeals.

174.   The Court of Appeals upheld the CERCLA Order. (*Housatonic River Initiative v.
United States EPA, 75 F.4th 248; 2023 U.S. App. Lexis 18977 July 25, 2023).*

175.   This action does not, cannot, and will not, interfere with the CERCLA Order or the
Settlement Agreement.

176.   The Town of Lee and its residents have suffered and will continue to suffer
damages from the contamination of the River and its consequences, including the
massive PCB dump to be built in Lee to house the dredged PCB mud.

177.   The compensatory and punitive damages Lee is seeking from Monsanto and GE are
a consequence of the intentional tort committed by GE and Monsanto as per GE-
Monsanto Contract of January 31, 1972.

178. Monsanto knew that PCBs were **toxic to humans and the environment** and communicated this fact to GE under the terms of the contract executed between GE and Monsanto *(DJ-20)*:

> *Buyer [GE] acknowledges that it is aware and has been advised by Monsanto that **PCB's tend to persist in the environment**; that care is required in handling, possession, use and disposition; that tolerance limits have been or are being established for PCBs in various food products.*
>
> *Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's (sic) including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sale and/or deliveries of PCB's (sic) by Monsanto to Buyer.*
>
> *Accordingly Buyer thereby covenants and agrees that, with respect to any and all PCB's (sic) sold or delivered by or on behalf of Monsanto to Buyer after the date hereof and in consideration of any such sale or delivery,  Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents from and against all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's (sic) by, through or under Buyer, whether alone or in combination with other ubstances, including, **without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's (sic).** (DJ-20 Emphasis here only).*

179. Monsanto sold PCBs under the terms of this contract and GE continued to profit from the use of PCBs knowing that PCBs were toxic to humans and the environment. Both companies carried this behavior without justification other than making money.

180. It was less expensive to GE to pay damage claims filed by humans for themselves and their environment than to loss profits from the use of PCBs.

181. Monsanto might have overreached as evident from claims of fraud made by a customer, in identical position as GE, for Monsanto's lack of total disclosure under the terms of the aforementioned contracts between Monsanto and Buyers. (*DJ- 31. Magnetek, Inc., v. Monsanto, Pharmacia and Solutia Superior Court of New Jersey Docket No.:BER -LE Complaint and Jury Demand. See also DJ-22 November 10, 2023 Letter of Counsel to GE.*)

182. The Town and its residents have suffered and will continue to suffer damages from their inability to use the Housatonic Rive as specified by EPA. (*DJ-24, DJ-3 pages 18 et seq.*)

183. The Town and its resident will suffer damages after GE complies with the 2020 CERCLA Order since the River bottom will be covered by a tarp which GE will continue to monitor for leaks for 20 years following the 13 years of dredging have been completed. (*DJ-3 pgs. 18 et seq., DJ-32 and 33*).

184. The Town and its residents will suffer damages as during the next 13 years of remediation two billion pounds of PCB contaminated muds and soil will be dredged from the River by GE, transported in eighty-thousand-pound truck loads through the streets of Lee, and deposited within the confines of the Town of Lee in a dump projected to be 150 feet in height with a 20-acre base.

185. The presence of this massive PCB dump in Lee will cause severe damages to the Town and its residents for years to come. Considering the public opposition that existed in their communities, opposition cited by the EPA in its 2016 remedy, it was very likely that Lenox, Great Barrington, Sheffield and Stockbridge with their wealth would have litigated at infinitum any attempt by GE to locate this massive dump within their towns' boundaries. Lee, the poorest town in the Berkshires, could never have afforded such continuing litigation. Thus, GE picked Lee as a place to dump the dredged mud.

186.  The Town of Lee is seeking, as *parens patriae* on behalf of its residents, compensatory and punitive damages from Defendants.

# FIRST CAUSE OF ACTION
## CIVIL CONSPIRACY BETWEEN GE AND MONSANTO
### TO HARM HUMANS AND THE ENVIROMENT

187.  The Town of incorporates by reference as if fully stated each allegation contained above.

188.  Defendants Monsanto and General Electric entered into a fully documented civil conspiracy on January 31, 1972 to continue selling the PCBs manufactured by Monsanto and purchased by GE in spite of the fact that Defendants agreed in writing that these sales and purchases harm humans and the environment.

189.  The civil conspiracy contract between Monsanto and GE meets the common law standard in Massachusetts of civil conspiracy law:

188.  For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he a) does a tortious act in concert with the other or pursuant to common design with him, or b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement  to the other so to conduct himself.

189.  There is no question that GE and Monsanto had a common design in entering into the 1971 agreement, and both knew unequivocally that their actions constituted a breach of duty to all impacted third parties, such as the Town of Lee acting as parens patriae for the residents of Lee.

190. For these reasons, the Town of Lee is seeking an award of compensatory and punitive damages at trial.


## SECOND CAUSE OF ACTION CRIMINALONSPIRACY
## BETWEEN  GE AND MONSANTO TO
## HARM HUMANS AND THE ENVIROMENT

191. The Town of Lee incorporates by reference as if fully stated each allegation contained above.

192. Defendants Monsanto and General Electric entered into a fully documented criminal conspiracy on January 31, 1972 to continue selling the PCBs manufactured by Monsanto and purchased by GE in spite of the fact that Defendants agreed in writing that these sales and purchases harm humans and the environment.

193.

194. The criminal conspiracy between Monsanto and GE meets the common law standard in Massachusetts for criminal conspiracy in Massachusetts in that "(1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily participated in the conspiracy.

195. For these reasons The Town of Lee is seeking an award of compensatory and punitive damages from both defendants at trial.

42

**PRAYER FOR RELIEF**

195. For these reasons, the Town of Lee seeks the following relief against the

Defendants:

1. Compensatory damages, in an amount to be proved at trial;

2. Natural resource damages;

3. Punitive damages;

6. Attorney's fees and expenses;

7. Costs of suit; and

8. Any other and further relief that the Court deems just, proper, and appropriate.

**JURY DEMAND**

**The Plaintiffs demand a jury trial on all causes of action for which a jury is available under the law.**

May 10, 2024

Respectfully submitted by

s/Cristóbal Bonifaz, Esq.
Cristóbal Bonifaz
Law Offices of Cristóbal Bonifaz
Attorney for Plaintiff
180 Maple Street
Conway, Massachusetts 01341
Tel: 413-369-4263
Cell Number 413-522-7604
Electronic Mail ccrbonifaz@gmail.com

<u>Certificate of Service</u>

Plaintiff the Town of Lee will serve all Defendants with this First Amended Complaint document on the same date that Defendants are served with the Summons, Original Complaint. Plaintiff's Motion for Partial Summary Judgment,  Material Facts as to Which There is no issue to be Tried, and Exhibits DJ-1 to DJ-38). Notification of the service will be filed in Court timely,

<u>s/ *Cristobal Bonifaz, Esq.*          </u>

Cristobal Bonifaz, Esq.